IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 21, 2008

Charles R. Fulbruge III
Clerk

No. 07-20184

CYNTHIA M. DAVIS

        Plaintiff - Appellee

v.

MICHAEL McKINNEY, M.D., Being Sued Individually and In His Official Capacity; and CHARLES G. CHAFFIN, Being Sued Individually and In His Official Capacity,

        Defendants-Appellants

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before DAVIS, STEWART and OWEN, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Defendants Michael McKinney and Charles Chaffin bring this interlocutory appeal challenging the denial of their summary judgment motion seeking dismissal based on qualified immunity from plaintiff Cynthia Davis' § 1983 suit for retaliatory discharge in violation of the First Amendment. For the reasons set forth below, we affirm in part, reverse in part and remand to the district court for further proceedings.

I.

Davis filed this suit against the above named defendants and the several arms of the University of Texas ("UT") System.  Prior to December 2003, Davis was the IS Audit Manager at the UT Health Science Center in Houston, Texas ("UTHSC-H").   As IS Audit Manager, Davis' job duties included overseeing computer-related audits and creating audit summaries and reports.  Defendant McKinney is the Senior Executive Vice-President and Chief Operating officer of UTHSC-H.  Defendant Chaffin is the UT System's Director of Audits and System-wide Compliance Officer.

In June 2003, Davis learned that the UT System was considering restructuring certain aspects of the UTHSC-H Internal Audit department and adding an Assistant Director position.  The position was officially announced in late June.  Davis told Sharon Corum, the director of the UTHSC-H Internal Audit Department and her direct supervisor, that she would like the position.  Thereafter, Corum sought and received permission from human resources and Dr. James Willerson ("Willerson"), UTHSC-H President, to waive the normal requirement that a search committee be used to find applicants for the job.

In August 2003, David Healey ("Healey"), UTHSC-H Vice President for Facilities Planning, approached the Internal Audit department and requested an audit of his department's computer systems because he suspected that employees were viewing pornography on work computers.  Davis, with the assistance of the IT Security department, investigated the computers in the Facilities department.  An expanded UTHSC-H wide investigation began in late August.  The investigation revealed that several computers had accessed pornographic material and that certain employees had intentionally accessed pornography.  A log of internet activity was developed to establish probable cause for confiscating computers at the request of Tex Martin, an inspector with

the UT System Office of the Director of Police. Martin provided the information to McKinney.

In late August 2003, Davis met with McKinney, Martin and Arline Staller. At the meeting, Davis presented evidence of 300 or more employees at UTHSC-H who were accessing pornography. McKinney authorized Davis to confiscate computers from employees if she had a clear indication that the access was intentional. McKinney expressed an intent to terminate the employees who had intentionally accessed the offending material and told Davis to schedule a meeting with him on September 2, 2003 to discuss the investigation.

After the meeting, Davis engaged IT Security and Information Service departments for assistance in confiscating computers from UT personnel. Eleven computers were identified that were believed to have intentionally accessed pornography. After further investigation, evidence in ten of the eleven computers strongly indicated that pornography had been intentionally accessed, including some material that Davis believed to be child pornography.

Davis attempted to meet with McKinney on September 2, 2003, as she had been directed, but McKinney was unavailable and never responded to Davis' request to contact her. That same day, Davis received a call from Mike Jimenez, UTHSC-H Human Resources Manager, asking Davis to return several of the confiscated computers to physicians. Davis alleges that she heard that McKinney wished to terminate the investigation, even though her analysis of the confiscated computers was not complete.

In response to Jimenez's request, Davis and the rest of the investigation team worked to copy the hard drives of the confiscated computers so they could be returned. Directory listings from the computers were provided to Human Resources. Davis noted that all of the users of the confiscated computers had signed acceptable use policy forms detailing the restrictions and permissible uses of the internet on work computers.

Davis continued the investigation and claims that she provided McKinney with lists of physicians whose computers contained pornography and included descriptions of the material that had been accessed. Davis also continued to ask McKinney to meet with her but he avoided any such meeting. She concluded that McKinney and others in upper management were turning a blind eye to the investigation. UTHSC-H physicians perceived the investigation as an intrusion into their privacy. Davis claims that several employees' supervisors chastised her and that a physician sent a demeaning letter about her to McKinney. Davis also heard that McKinney was accusing her of botching the investigation. Corum told her that the Internal Audit department was receiving the brunt of employees' disdain toward the investigation.

Around September 9, 2003, Davis asked Corum to be taken off the investigation because she felt it created a hostile work environment and the requirement that she review repugnant pornographic material denigrated her as a woman. Davis felt that she was receiving "heat" from other employees and that management was unresponsive to the findings of the inquiry.

On September 11, 2003, Davis applied for the newly created Assistant Director position for UTHSC-H's Internal Audit department. Around the same time, she sought assistance from the Employee Assistance Program to cope with the stress of dealing with the pornography and receiving no support in the investigation from UTHSC-H or the UT System. Davis also contacted the EEOC about discriminatory behavior of UT's upper management.

Davis claims that shortly thereafter her work responsibilities were reduced to mundane tasks. She heard from Corum that upper management, particularly Chaffin, were pressuring Corum to terminate Davis. Davis also claims that she heard that McKinney was threatening adverse action against the Quality Assurance Review team, which Davis had joined years earlier on Chaffin's recommendation, if Davis was not terminated.

4

On October 12, 2003, Davis wrote a letter to Willerson, UTHSC-H President, accusing UTHSC-H and UT System upper management of several unethical and allegedly illegal activities (the "Complaint Letter"). A complete copy of the Complaint Letter is attached to this opinion as an Appendix. Davis sent copies of the letter to Corum and Mark Yudof, the UT System Chancellor. The Complaint Letter alleged that upper management had a pattern of sweeping pornography investigations under the rug and not terminating or disciplining offending employees. In the Complaint Letter, Davis detailed the most recent investigation and complained that McKinney had not taken corrective action. She also outlined a pattern of treating certain employees, white men, physicians and faculty members more leniently than black employees. Davis asserted that in the course of the investigation she, a female, under the direction of males, had been required to view horrific and deviant pornography that men had been viewing at work, and then men in supervisory positions excused the behavior. Davis also stated that as a result of the investigation, her reputation and credibility had suffered, even though she was doing her job.

The Complaint Letter also alleged that the president was creating an excessive number of highly paid upper management positions to the detriment of the division's budget, demonstrating a pattern of favoritism towards white men and persons with political influence. Davis stated that she viewed Willerson's failure to address the issues brought to him as a dereliction of his duties to the university, its students, employees, patients and Texas taxpayers.

Near the end of the Complaint Letter, Davis wrote that because she was no longer confident that the UT System could investigate itself, she had contacted the Federal Bureau of Investigation concerning possible child pornography on eight computers and the EEOC about discriminatory practices.[1]

---

[1] The record does not reveal precisely when Davis contacted these agencies or what she told them. We can infer from the record that she relayed to the FBI her suspicion that federal

5

Willerson responded by outlining his response to the most recent pornography investigation. Other issues were not addressed.

In November 2003, Davis emailed Corum inquiring about the status of her application for the Assistant Director position. Corum had previously indicated to her that Davis was the most likely candidate to be selected for the position because she was the most qualified. In response to Davis' inquiry, Corum advised her that McKinney had frozen the position and it would not be filled. Davis contends that this action was taken in retaliation for her Complaint Letter and related reports to the FBI and EEOC. McKinney asserts that he froze the position because he was considering outsourcing the entire internal audit function. He also alleges that he and Corum met in September and determined that if Davis were promoted to Assistant Director, she would still have to participate in pornography investigations after her request to be relieved from those duties.

In December 2003, feeling that her termination was imminent, Davis resigned from UTHSC-H. Davis had been diagnosed with depression and felt that her workplace conditions had grown so deplorable that she had been constructively discharged.

In February 2004, the FBI concluded its review of the hard drives of the ten confiscated computers and found no child pornography.

Davis filed suit in May 2005 against McKinney, individually and in his official capacity, and Chaffin, individually and in his official capacity.[2] Davis alleges that McKinney and Chaffin violated her civil rights, pursuant to the

---

laws were being violated by the presence of child pornography on certain seized computers and that she relayed to the EEOC the charge that UTHSC-H was discriminating against women and African-Americans in its imposition of sanctions for violations of the University's internet use policy.

[2] Davis also named the UT System, UT Board of Regents and UTHSC-H as defendants. The UT entity defendants were dismissed by the district court in October 2005.

Fourteenth Amendment and § 1983, by retaliating against her for exercising her First Amendment free speech rights in her Complaint Letter and related communications to the FBI and EEOC. Davis contends that the defendants retaliated against her by failing to promote her and thereafter constructively discharging her from her position at UTHSC-H by subjecting her to a hostile work environment.

McKinney and Davis filed a motion for summary judgment arguing that the Complaint Letter was speech made pursuant to Davis' official work duties and therefore not afforded First Amendment protections. They also argued that they are entitled to qualified immunity from all claims asserted against them in their individual capacities because there is no evidence that they violated Davis' constitutional rights and their actions were objectively reasonable. The district court denied the motion. The district court found that the Complaint Letter "while constituting 'mixed speech,' predominantly addresses matters of public concern, rather than private concern, and that Plaintiff wrote the letter as a citizen, rather than an employee." Accordingly, Davis' speech was protected under the First Amendment. On the issue of qualified immunity, the district court found that Davis had raised a genuine issue of material fact regarding whether she was fired (or constructively discharged) for writing the Complaint Letter. In addition, the district court found that the defendants' actions regarding Davis' employment at UTHSC-H were not objectively reasonable and that they were not entitled to qualified immunity. The defendants appeal.

II.

This court does not ordinarily have jurisdiction to review a denial of a motion for summary judgment. However, the district court's order denying qualified immunity is immediately appealable to the extent it turns on a question of law. Gobert v. Caldwell, 463 F.3d 339, 344 (5ᵗʰ Cir. 2006). This panel thus has jurisdiction only to determine whether McKinney and Chaffin are

entitled to qualified immunity as a matter of law, viewing all record evidence in the light most favorable to the plaintiff Davis. Kinney v. Weaver, 367 F.3d 337, 348 (5th Cir. 2004)(en banc).

> To determine whether an official is entitled to qualified immunity, the court asks (1) whether the plaintiff has alleged a violation of a constitutional right, and (2) whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident.

Connelly v. Tex. Dep't of Crim. Justice, 484 F.3d 343, 346 (5th Cir. 2007). The threshold question in this case, whether Davis's speech in the Complaint Letter is protected under the First Amendment, is a question of law, which we have jurisdiction to address. Connick v. Myers, 103 S.Ct. 1684, 1691 n.7 (1983).

III.

The defendants argue that the district court erred in denying their motion for summary judgment in which they asserted that they were entitled to qualified immunity from Davis' claims. The defendants argue first that they did not violate Davis' First Amendment rights since her Complaint Letter related to her job duties as an internal auditor at UTHSC-H and did not comment on matters of public concern.

The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen on matters of public concern. Pickering v. Board of Educ., 391 U.S. 563, 568 (1968). Prior to the Supreme Court's most recent pronouncement on the First Amendment rights of public employees in Garcetti v. Ceballos, 126 S.Ct. 1951 (2006), this court applied

> two tests, sometimes in conjunction with one another, to determine whether speech relates to a public concern; both tests derive from Connick v. Myers, 461 U.S. 138, 75 L.Ed.2d 708, 103 S.Ct. 1684 (1983). The first is the content-form-context test: "whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement,

as revealed by the whole court record." Id. at 147-48; see also Tompkins v. Vickers, 26 F.3d 603, 606 (5th Cir. 1994).

The second "shorthand" test is the citizen-employee test: "when a public employee speaks not as a citizen on matters of public concern, but instead as an employee upon matters of only of personal interest," the employee's speech falls outside the parameters of speech involving matters of public concern. Connick, 461 U.S. at 147 (emphasis added); see also Schultea v. Wood, 27 F.3d 1112, 1120 (5th Cir. 1994), superseded on other grounds by, 47 F.3d 1427 (5th Cir. 1995) (en banc). The citizen-employee test can yield indeterminate results because "the existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern." Dodds, 933 F.2d at 273. Thus, "in cases involving mixed speech, we are bound to consider the Connick factors of content, context, and form, and determine whether the speech is public or private based on these factors." Teague, 179 F.3d at 382.

Kennedy v. Tangipahoa Parish Library Bd .of Control, 224 F.3d 359, 366 (5th Cir. 2000).

Garcetti changed this analysis in ways not yet fully determined. In Garcetti, a supervising district attorney, Ceballos, reviewed a case in which defense counsel claimed the affidavit police used to obtain a critical search warrant was inaccurate. After determining that the affidavit made serious misrepresentations, Ceballos relayed that finding to his supervisors via a disposition memo recommending dismissal of the criminal case. There was no question in Garcetti that the plaintiff in that case wrote the disposition memo pursuant to his employment duties. 126 S.Ct. at 1961. Ceballos was required as part of his job as a prosecutor to write memos such as the one in question to assess the validity of searches and make recommendations related to the exercise of prosecutorial discretion. The Supreme Court concluded that the First Amendment did not protect Ceballos' expressions in the disposition memo which were written pursuant to his official duties as an employee. Id. at 1960.

Because of Ceballos' concession that he wrote the memo pursuant to his duties as a prosecutor, the Supreme Court did not have occasion in that case to "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." Id. at 1961. However, the case provides some guidance, indicating that a formal job description is not dispositive, id., nor is the fact that the speech relates tangentially to the subject matter of one's employment. Id. at 1959. The case also lists examples of prototypical protected speech by public employees, namely "mak[ing] a public statement, discuss[ing] politics with a coworker, writ[ing] a letter to newspapers or legislators, or otherwise speak[ing] as a citizen." Spiegla v. Hull, 481 F.3d 961, 967 (7th Cir. 2007), citing Garcetti. at 1960, 1961.

While all implications of Garcetti have not been developed at this point, it is clear that Garcetti added a threshold layer to our previous analysis. Williams, 480 F.3d at 692. "Under Garcetti, we must shift our focus from the content of the speech to the role the speaker occupied when he said it." Id. The Seventh Circuit has framed the new test in a manner we find persuasive, as follows:

> Garcetti . . . holds that before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking "as a citizen" or as part of her public job. Only when government penalizes speech that a plaintiff utters "as a citizen" must the court consider the balance of public and private interests, along with the other questions posed by Pickering and its successors, such as Waters v. Churchill, 511 U.S. 661, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994); Connick v. Myers, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); and Givhan v. Western Line Consolidated School District, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979).

Mills v. City of Evansville, 452 F.3d 646, 647-48 (7th Cir. 2006). An education law treatise describes the inquiry similarly as follows:

> The inquiry whether the employee's speech is constitutionally protected involves three considerations. First it must be determined whether the employee's speech is pursuant to his or her official duties. If it is, then the speech is not protected by the First Amendment. Second, if the speech is not pursuant to official duties, then it must be determined whether the speech is on a matter of public concern. Third, if the speech is on a matter of public concern, the Pickering test must be applied to balance the employee's interest in expressing such a concern with the employer's interest in promoting the efficiency of the public services it performs through its employees. (Footnotes and citations omitted).

Ronna Greff Schneider, 1 Education Law: First Amendment, Due Process and Discrimination Litigation § 2:20 (West 2007).

Accordingly, our first task is to determine whether Davis' speech was part of her official duties, that is whether she spoke as a citizen or as part of her public job. Because <u>Garcetti</u> is a recent decision, lower courts have had limited opportunity to interpret it. This circuit has had occasion to apply <u>Garcetti</u> in one case, <u>Williams v. Dallas Indep. Sch. Dist.</u>, 480 F.3d 689 (5th Cir. 2007). In that case, this court applied the <u>Garcetti</u> analysis to speech that was not necessarily required by the plaintiff's job duties, but was closely related to his job duties. Williams, an Athletic Director, wrote a memo to his school principal and office manager requesting information about the use of funds collected at athletic events, including negative remarks about how the school allocated those funds. After reviewing pre- and post-<u>Garcetti</u> caselaw, we concluded that the cases "distinguish between speech that is 'the kind of activity engaged in by citizens who do not work for the government and activities undertaken in the course of performing one's job.'" <u>Id</u>. at 693 (internal citation to <u>Garcetti</u> omitted). Activities undertaken in the course of performing one's job are activities pursuant to official duties and not entitled to First Amendment protection. <u>Id.</u> We found that Williams wrote the memo in the course of performing his job because he needed account information from the principal and office manager

so that he could perform his duties as Athletic Director, namely, taking students to tournaments and paying their entry fees. Id. at 694. His memo reflected his special knowledge about the situation gained as athletic director. In addition, his comment that the principal had established "a network of friends and house rules," for use of these funds related to his concerns about his athletic program.

Cases from other circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job. Spiegla, 481 F. 3d at 966 (Correction officer's reports to assistant superintendent of the prison in which she worked regarding a possible security lapse which occurred at her assigned position at the main gate was part of her official responsibility as a correction officer to keep the prison secure.); Battle v. Bd. of Regents, 468 F.3d 755, 761 (11th Cir. 2006)(University employee's internal report which alleged improprieties in her supervisor's handling of federal financial aid funds was made pursuant to her official employment responsibilities as a financial aid counselor.); Foraker v. Chaffinch, 501 F.3d 231 (3d Cir. 2007)(Instructors at Delaware State Police Firearms Training Unit were acting within their duties as employees by bringing health and safety concerns about the range up the chain of command and to the state auditor.)[3]

If however a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen. Freitag v. Ayers, 468 F.3d 528 (9th Cir. 2006). In Freitag, the plaintiff was a corrections officer at the Pelican Bay State Prison in

---

[3] We recognize that it is not dispositive that a public employee's statements are made internally. Williams, 480 F.3d at 694, n.1., citing Garcetti and Givhan v. Western Line Consold Sch. Dist., 439 U.S. 410 (1979). However, as illustrated above, the caselaw is unanimous in holding that employee's communications that relate to his own job function up the chain of command, at least within his own department or division, fall within his official duties and are not entitled to First Amendment protection.

California. She encountered a pervasive practice of male inmate exhibitionist behavior directed at female officers, including herself personally, over a period of several months. Id. at 532. Freitag's complaint alleged that she was retaliated against and ultimately terminated due to her repeated complaints about the problem. Id. The court listed six examples of Freitag's speech on the subject: (a) reports to agents of the California Department of Corrections within the Pelican Bay State Prison, formally and informally; (b) documenting Pelican Bay State Prison's responses or failure to respond to her reports of sexually hostile inmate conduct; (c) informing the Director of the California Department of Corrections of the prison's failure to respond; (d) informing a State Senator of the inmate conduct and the prison's failure to respond; (e) reporting the same to the Office of the Inspector General; and (f) cooperating with the investigation conducted by the Office of the Inspector General. Id. at 544. As to items (d), (e) and (f), the Ninth Circuit found that Freitag was acting as a citizen when making those communications. "Her right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee." Id. at 545. "It was certainly not part of her official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." Id. In contrast, her communications within the prison internally, in (a) and (b) above, were pursuant to her official duties as a correction officer and thus not in her capacity as a citizen. With regard to item (c), the Ninth Circuit was "unsure whether prison guards are expected to air complaints regarding the conditions in their prisons all the way up to the Director of the CDCR at the state capitol in Sacramento" and remanded the case to allow the district court to make that determination. Id. at 546.

The communications in this case require a similar analysis - that we look at Davis' role both when she sent the Complaint Letter and when she

communicated with the FBI and EEOC.   As in Freitag, the Complaint Letter was sent not just up Davis' chain of command to Dr. Willerson, the President of UTHSC-H, where Davis was employed, and to Sharon Corum, her immediate supervisor.  Davis also sent copies to Mark Yudof, Chancellor of the UT System. Davis also complained to external, unrelated entities.  She  contacted the FBI concerning the possible child pornography she found and the EEOC on the discriminatory practices.

With respect to the content of the Complaint Letter, some of it clearly relates to Davis' job as an internal auditor, other parts do not.  Davis' Complaint Letter has two main topics.  The first topic concerns complaints about what she considered the inadequate response to her investigation of employees accessing pornography on university computers, including claims that the university ignored possible criminal activity and engaged in racial discrimination in its imposition of sanctions for computer use violations.  The second topic is Davis' complaints about the number and pay of executive vice presidents and vice presidents at UTHSC-H, raising issues of political favoritism and fiscal mismanagement, and the effect of these practices on employee morale.

In "mixed" speech cases, Freitag supports analyzing separately each aspect of a communication with multiple topics and recipients.  Pre -Garcetti case law also supports analyzing mixed speech in a single communication by dividing the communication by topic and applying First Amendment analysis to each topic separately.  In Connick v. Myers, an assistant district attorney unhappy with a proposed transfer to another department, circulated a survey to "fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns."  461 U.S. at 141.  The Court viewed most of the topics in the survey as private matters, "mere extensions of Myers' dispute over her transfer to another section of the criminal court."  Id. at 148.

The Court treated differently, however, the aspect of the survey that questioned whether the staff felt pressured to work in political campaigns on behalf of office supported candidates. The Court concluded that this speech raised a matter of public concern. Id. At 149. Although Connick dealt with distinguishing matters of public concern from matters of private concern and not whether the speech was made as part of an employee's official duties, which is the issue in this case, we believe that it can be read as support for considering separately discrete topics within a single communication for purposes of applying post-Garcetti First Amendment analysis.

Dividing Davis' speech, both in the Complaint Letter and in her other communications, into components as the Ninth Circuit did in Freitag discloses the following components:

(a) concerns about the inadequate response to Davis' pornography investigation for the internal audit department directed to Dr. Willerson, president of UTHSC-H, and to Sharon Corum, Davis' immediate supervisor;

(b) concerns about the excessive number and pay of vice presidents directed to Dr. Willerson and Sharon Corum;

(c) concerns about the inadequate response to Davis' pornography investigation for the internal audit department directed to Mark Yudof, Chancellor of the UT System;

(d) concerns about the excessive number and pay of vice presidents directed to Mark Yudof, Chancellor of the UT System;

(e) concerns about the presence of possible child pornography on UTHSC-H computers directed to the FBI;

(f) concerns about racial discrimination at UTHSC-H directed to the EEOC.

The district court did not discuss the individual components of Davis' speech listed above or consider whether each category of speech was related to plaintiff's

job duties. Instead, it treated the Complaint Letter and other communications as a whole. However, because the question of whether a communication is made as an employee or as a citizen is a question of law, we proceed with the analysis.

Item (a) above was clearly made as an employee. Although Davis had requested that she be removed from further pornography investigations, the letter related to her work within the internal audit department and to her core job description, "to oversee computer-related audits and create audit summaries and reports." The communication was sent to her immediate supervisor, Sharon Corum, and the President of her division of the UT System, in other words, up the chain of command seeking redress for what she felt was an inadequate response to the findings of her investigation.

In contrast, item (b), the portion of her letter dealing with the number of vice presidents and related issues, was not written as part of her job duties as a internal auditor. The topic does not relate to computer use or the internal audit department specifically. There was no financial component to Davis' position. Accordingly, that communication was made as a citizen.

Item (c), the Complaint Letter to the Chancellor of the UT System, is more difficult. It is comparable to Freitag's complaints regarding conditions at the prison to the state director of prisons. Speech related to an employee's job duties that is directed within the employee's chain of command is not protected. The question is how high within an organization an employee's reporting responsibilities extend. Fortunately, our review of the record reveals that Chancellor Yudof was indisputably within Davis' chain of reporting responsibilities on internal audit issues. The UT System is made up of nine academic universities and six health institutions. The UTHSC-H division for which Davis worked is one of the six health institutions under the UT System. The record includes the following information about reporting within the UT

System and by the audit departments in particular.  Defendant Chaffin stated in an affidavit

> To provide for the independence of the Internal Auditor function, auditors at the U.T. System component institutions do not report to U.T. System but report directly to the administration of their component institution as provided by the University of Texas System Business Procedures Memorandum 18.

Memorandum 18 states that in "Large Institutions" like the UTHSC-H with freestanding internal audit departments, the audit departments report to the president of the institution and meet with their institution's internal audit committee at least quarterly.  Reports from the audit committee are submitted to the Executive Vice Chancellor for Academic or Health Affairs and the System Audit Director.  Audit reports with significant audit findings and recommendations are summarized for the Audit, Compliance, and Management Review Committee.  The chancellor attends meetings of the Audit, Compliance, and Management Review Committee and provides direct communication between the System Audit Director, the committees and senior management. Memorandum 18 states that the chancellor is "Responsible for insuring the implementation of appropriate audit procedures for the system."  Davis viewed Chancellor Yudof as being in the chain of her reporting responsibilities as an internal auditor.  In her deposition, she was asked if she had ever gone over the head of Dr. Willerson, president of her division, to report that McKinney was trying to stop her investigation.  Davis answered that she had not.  However, when asked to whom she would have gone, she answered, "I would have gone to Mr. Yudof."  Accordingly, we conclude that Davis' communication of her complaints about the handling of internal audit investigations at UTHSC-H to the Chancellor of the UT System was made as an employee.

In contrast, her complaints to Chancellor Yudof relating to the number of vice presidents and related concerns, item (d), have nothing to do with her job function as an internal auditor and therefore were made as a citizen.

Items (e) and (f), the reports to the FBI and EEOC, were not made as an employee. Defendant Chaffin testified at his deposition that it was not within an auditor's job function to communicate with outside police authorities or other agencies in an investigation. Davis' supervisor Corum testified that it was highly unusual for an auditor to involve any outside authority with respect to matters occurring at UTHSC-H and she could not recall it ever happening in her 12 years with the division. This communication is comparable to Freitag's communication to a State Senator and the State Inspector General.

Those aspects of Davis' communications that were made as a citizen qualify for First Amendment protection if they raise a matter of public concern. The district court found that "the confluence of factors surrounding Plaintiff's Complaint Letter militate in favor of a finding that the letter, while constituting 'mixed speech,' predominantly addresses matters of public concern, rather than private concern." Although the defendants mention both aspects of the test in their brief to this court - citizen vs. employee and public vs. private concern - their argument focuses solely on whether Davis' speech in the Complaint Letter was made as an employee rather than as a citizen - not whether it raised matters of public concern. Other than stating that the Complaint Letter does not raise matters of public concern, the Defendants do not brief the issue separately and do not discuss at all whether communications to the FBI or EEOC raise matters of public concern. On remand, the district court after briefing by the parties should consider whether the aspects of Davis' speech we have concluded are not job related raise issues of public concern. To the extent any category of speech raises matters of public concern, the district court should

apply the <u>Pickering</u> balancing test to such speech and deny or grant summary judgment based on its conclusions.

## IV.

Both McKinney and Chaffin argue that the district court erred in denying them qualified immunity from all claims asserted against them in their individual capacities because their actions were objectively reasonable. Evaluating a claim for qualified immunity is a two-step inquiry. First, a court must decide whether the plaintiff's allegations, if true, establish a violation of a clearly established right. <u>Hare v. City of Corinth</u>, 135 F.3d 320, 325 (5th Cir. 1998)(en banc). Second, if the plaintiff has alleged a violation, the court must decide whether the conduct was objectively reasonable in light of clearly established law at the time of the incident. <u>Id.</u> Even if the government official's conduct violates a clearly established right, the official is entitled to qualified immunity if his conduct was objectively reasonable. <u>Id.</u>

McKinney and Chaffin challenge the district court's conclusions on the second prong - that their actions were not objectively reasonable. At the time of the alleged violation of Davis' free speech rights, both Supreme Court and Fifth Circuit law clearly proscribed retaliation by a government employer against an employee for engaging in protected speech. <u>Pickering</u>, 391 U.S. at 568; <u>Connick</u>, 461 U.S. at 146-47; <u>Teague v. City of Flower Mound</u>, 179 F.3d 377, 380-82; <u>Davis v. Ector County, Tex</u>, 40 F.3d 777, 782 (5th Cir. 1994).

Chaffin argues that he was a UT System employee with no direct supervisory authority over Davis and her supervisor Corum who were employed at UTHSC-H. Chaffin also argues that an unexecuted threat of termination is not an adverse employment action that could support a § 1983 First Amendment retaliation claim. Davis pled that Chaffin had actual authority over employment decisions at UTHSC-H, and supported that allegation with deposition testimony of herself and her supervisor Corum. In addition, Davis alleges constructive, not

actual, termination, negating Chaffin's argument about the effect of an unexecuted threat. The district court found that Davis presented evidence raising a genuine issue of material fact as to whether Chaffin retaliated against Davis for the speaking out on the issues presented in the Complaint Letter. Chaffin's arguments challenge Davis' versions of the events, raising questions of fact which we have no jurisdiction to consider at this time.

McKinney argues that his actions freezing the hiring for the position of Assistant Director of audit were objectively reasonable because he was considering outsourcing the entire Audit Department or other reorganization options. He also argues that this action was objectively reasonable because Davis asked to be relieved of viewing pornography and reviewing pornography investigations was part of the job duties of the proposed Assistant Director of Audit position. Again, these arguments challenge Davis' version of the facts. Davis produced evidence that McKinney, who presided over Davis' pornography investigation, never viewed the pornography found on the department's computers. The district court found that there was a genuine issue of fact with regard to McKinney's motivations for freezing the position. As these arguments raise questions of fact, we have no jurisdiction to consider them at this time.

V.

Accordingly, for the reasons set forth above, we reverse the district court's denial of summary judgment in part on the issue of whether Davis' speech was entitled to First Amendment protection insofar as it relates to those aspects of Davis' speech that were made as an employee, rather than as a citizen. The district court's judgment is affirmed in all other respects and this case is remanded for further proceedings consistent with this opinion.

AFFIRMED in part. REVERSED in part. REMANDED.

APPENDIX

MEMORANDUM

TO:        Dr. Willerson, President
University of Texas Health Science Center at Houston

FROM:     Cynthia M. Davis, IT Audit Manager
University of Texas Health Science Center at Houston (UT-Houston)

DATE:     October 12, 2003

SUBJECT:  UNETHICAL AND POSSIBLE ILLEGAL ACTIVITIES at UT-Houston

[Ms. Davis first describes the requires for her to investigate the use of state computers to view pornography. She then reviews the procedures she followed, and finally describes some of her findings. The letter continues as follows:]

The University continues to perpetuate a hostile working environment with its pattern of <u>not</u> handling pornography..

- Nothing was done in 1999 when a Family Practice physician was discovered to have child pornography on his computer. No reports were filed, the AMA was not alerted and the physician was allowed to resign with no sanctions whatsoever.

- Nothing was done in 2000 when I discovered and reported a faculty member producing pornographic videos of himself masturbating in his office and trafficking it on the Internet.

- In 2000, three young, black classified employees were terminated within weeks that the faculty member was investigated and unsanctioned.

- a highly visible white classified male was not terminated when it was discovered that he viewed pornography at work.

- in the most recent audit, 10 men were discovered viewing pornography, eight of them with possible child pornography on the computers, and the investigation has been stopped with no explanation, even after I told my superiors much of the information above and my complete disgust with the University's approval of such behavior.

I am unable to perform my job without interference from management. My role is no longer effective at the University. In the case of [one physician], I received a memo directed to McKinney by [another physician] attacking me for doing my job. His excuses for [the first physician] are baseless and I am told that McKinney has responded to the letter, although I have not been provided a copy.

Once again, executive management has taken no definitive action against employees who use state resources to view pornography for personal purposes. Since little to nothing is done, I have been repeatedly subjected to pornographic material that degrades women and children. This has created a hostile working environment for me because my efforts go unsupported. Men viewed the pornography, men requested the investigation, I a female, was the only employee ordered to view the material, and men excused the behavior of their colleagues.

Once the decision was made to not terminate any of the employees, the focus of attention was switched from the real problem of employees viewing pornography to the investigation itself. I personally have been blamed for a "botched" investigation although procedures were correctly followed and decisions were made by Martin and McKinney. Neither of these men made any attempt to correct the misperception (and appear to be propagating it) nor gave me the opportunity to respond to these allegations.

Despite evidence that child pornography was accessed, the investigation was stopped with no explanation. I opted out of doing further investigation because the University forces me to view pornography, has taken no action to remedy the problem, and now appears to just want to sweep it under the rug.

Research at our own School of Public Health linking pornography to deviant behavior should increase the desire of the University management to diligently investigate these cases and take strong action. Management consistently protects the perpetrators and ignores the rest of those that put their trust in this the University – students and patients.

The University's continuing track record of 'doing nothing" implicitly endorses the use of state resources for unsavory and possibly illegal activity. The University posts policies about this kind of behavior but when their colleagues are actually caught violating the policy they defend them by saying that they weren't explicitly told not to view pornography at work. We trust them to educate our future health care professionals and treat patients, they are outstanding researchers discovering cures for disease but they don't know that they shouldn't view pornography at work?

You should know that I selected only a very small sample of persons that view pornography at the University, the problem is much greater than 10 people. I have Internet logs which were run on 9/3/2003 which show a much greater population. You

22

should review the material on these computers so you know how horrific this is. Most material is actual videos of sexual intercourse, some deviant, most of women and young girls being violated. I gave McKinney the evidence, he ignored it and instead turned the attention to me as an excuse for not dealing with the real issue which is terminating employees for regularly viewing pornography.

My reputation has suffered significantly since this investigation, my credibility has been questioned and my ability to continue to be effective at the University is serious damaged because I chose to perform my job duty at the direction of UT system and McKinney. I have even been forced to obtain help from the Employee Assistance Program (EAP) as a result of all of this. I would have continued to seek help from EAP but realized I can longer trust the University to protect my rights. I believe the University would use the emotional problems I was experiencing as a result of this investigation against me. I am seeking help elsewhere.

It has become quite clear to me that neither you or McKinney take Auditing & Advisory Services, Legal or Compliance seriously and the "new" management method is to either promote and pay exorbitant salaries for silence or terminate those that don't agree with you. It should be noted that many of the staff and VPs you terminated were the Chief Legal Officer, Chief Compliance Officer and one-half of the Audit department. Since McKinney is currently admonishing Auditing for the pornography investigation, it appears that the remaining Audit department is now being scrutinized!

It has also been noted that you removed all external members from the Audit Committee. These actions create the appearance that the University has things to hide and doesn't wish to involve outside parties, is not concerned about complying with laws, regulations and does not feel terribly responsible for protecting taxpayer's assets. Ignoring advice from legal, audit and compliance is endangering the reputation of the University and appears to be ignoring the rights of <u>all</u> employees, students and patients.

This pattern of behavior is very disturbing. Besides the fact that you appear to condone male physicians and male employees' viewing of pornography using state-owned resources, it appears that you show favoritism towards white men and persons that can help you politically. The number of executive vice president's and vice president's you have placed at the University is now up to eleven(11). I have looked into the matter and can't see what help these appointments provide, other than political favoritism. Also, I am unable to find another UT component that has close to this amount of vice presidents. I, among most of the University, don't understand how creating executive positions and paying them large sums of money contributes to an efficient and cost-effective administrative structure for the University. The appearance that McKinney created his own senior executive position and demands well in excess of a one-half million dollar salary is revolting. The additional fact is that

two minorities in the President's office used to hold executive positions but are now simply vice presidents. These are the facts and it does not look good.

It is apparent that you have an agenda to fulfill the University's mission in education, research and service. What is not apparent is how overpaying executives is contributing to this mission. It would be extremely helpful if you would provide performance measures for the executive positions and other positions like [one specific] position. Perhaps explaining to the rest of the University and tax payers how these executives contribute to the growth of the University and generate revenue that exceeds their administrative costs, would further your cause more effectively than telling us at Management Forum that if we aren't in sync with your vision we can just leave. That speech is not only arrogant but extremely demoralizing. It should be no surprise why our SECC campaign is at an all-time low. This is the true reflection of how your employees feel about this University.

The view of the University and its current management is extremely negative. My experience is that your employees have lost faith in the University's ability to be equal and just. I believe you have the power to change that view by proving that what you are doing is ethical and responsible. Perhaps we just don't understand that it takes more executive vice presidents to achieve your mission. All we see is layoffs of classified staff, discriminatory practices, the protection of men viewing pornography and elevating white men to high paying executive positions.

You have a legal, moral and ethical obligation to the University and the citizens of Texas. Auditing, Legal and Compliance are here to assist you minimize risk to this University and even your reputation. Your refusal to address the issues brought to you, even if they are "about" you is a dereliction of your duties and appears that you don't take those obligations seriously.

Our employees, students and patients deserve to work, learn and be treated in a safe environment. The state of Texas taxpayers deserve to know that the money they give us is used thoughtfully and honestly. The patients that come to use for care deserve to know that the treatment we provide is provided by men and women who have high ethics and would not behave in any way that would endanger their safety. The taxpayers deserve to know the truth about unethical behavior at the University which occurs at their expense.

Since I am no longer confident that the University can investigate itself, I have elevated my concerns to external agencies in the hope that this institution can be restored to a place of integrity and honor. I have contacted the Federal Bureau of Investigation (FBI) concerning the possibly child pornography on the eight computers and I have contacted the Equal Employment Opportunity Commission (EEOC) on the discriminatory practices. Nothing has happened yet with these agencies except dialogue, but it is my sincere desire that you work with them to return the University to a place of integrity, honor, fair treatment of all of its employees, and ethical, moral

physicians and men who are <u>not</u> endangering women and children because they are allowed to view pornography using state-owned resources.

I honestly believe that you will alter your behavior and do the right thing because I think you take a lot of pride in your position and you do believe in the mission of the University. There are many misconceptions and the appearance of unethical and illegal activities being sanctioned by you and only you have the power to change that. I look forward to working with you and these agencies to make the University the best University in the world and a place to be proud of!

I would like to meet with you and Chancellor Yudof at the earliest opportunity to explore these issues. Please let me know when we can meet.

Cc: Sharon Corum
    Mark Yudof