# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 29, 2013

No. 12-60905

Lyle W. Cayce
Clerk

ANTHONY GIBSON,

> Plaintiff-Appellee Cross-Appellant

v.

JEFFREY KILPATRICK, in His Individual Capacity,

> Defendant-Appellant Cross-Appellee

Appeals from the United States District Court
for the Northern District of Mississippi

Before STEWART, Chief Judge, KING, and PRADO, Circuit Judges.

KING, Circuit Judge:

While serving as the Chief of Police in Drew, Mississippi, Anthony Gibson reported Mayor Jeffrey Kilpatrick to outside law enforcement agencies for misuse of the city gasoline card. Months later, Kilpatrick began issuing written reprimands to Gibson for a panoply of alleged deficiencies. Gibson subsequently filed a lawsuit alleging unconstitutional retaliation as well as state tort law claims. Kilpatrick moved for summary judgment, raising the defense of qualified immunity and arguing that the state tort law claims were barred because Gibson failed to comply with state notice requirements. The district court denied the motion with respect to qualified immunity, but granted it with respect to the state tort claims. Kilpatrick now brings this interlocutory appeal of the district

No. 12-60905

court's order denying qualified immunity, and Gibson cross-appeals the district court's dismissal of one of his tort claims. Kilpatrick moves to dismiss the cross-appeal for lack of jurisdiction. We hold that Kilpatrick is entitled to qualified immunity and reverse the district court's order to the extent that it denied qualified immunity. Additionally, because we lack jurisdiction to hear Gibson's cross-appeal, we grant Kilpatrick's motion to dismiss the cross-appeal.

## I. Factual and Procedural Background

In 2006, Anthony Gibson applied to be Chief of Police in Drew, Mississippi. Mayor Jeffrey Kilpatrick opposed Gibson's application and supported another candidate. The city's Board of Aldermen ("Board") rejected Kilpatrick's recommendation and hired Gibson in August 2006. As Chief of Police, Gibson reported directly to Kilpatrick and the Board.

Sometime within the first four months of Gibson's employment, a subordinate at the police department informed Gibson that Kilpatrick was misusing the city gasoline card to fuel his vehicle for personal trips. Gibson confidentially reported his suspicions to the Federal Bureau of Investigation ("FBI"), Drug Enforcement Agency ("DEA"),[1] Mississippi Office of the State Auditor ("OSA"), and Mississippi Attorney General's Office. His reports to the FBI and DEA were through contacts with whom he had worked in an official capacity on prior occasions. The OSA initiated an investigation, and Gibson worked with Investigator Karen Swain to assist in the OSA's efforts. Because Kilpatrick had to come to the police department to obtain the gasoline card, Gibson was able to monitor Kilpatrick's activities. Gibson instructed two police dispatchers to make log entries every time Kilpatrick asked to use the card, and he ordered a police officer to observe Kilpatrick following receipt of the card.

---

[1] Gibson heard rumors that Kilpatrick might be involved in illicit drugs; however, this allegation was never investigated or substantiated. It did prompt his decision to contact at least the DEA.

No. 12-60905

Gibson and Swain also directed the city clerk to monitor receipts from Drew's gasoline provider to compare them with the information recorded in the log. In September 2008, the investigation concluded, finding that Kilpatrick had misused the city gasoline card, and the OSA ordered Kilpatrick to repay approximately $3,000 to the City of Drew for his unauthorized use of the card.

Approximately nine months after the conclusion of the investigation, Kilpatrick began entering written reprimands into Gibson's personnel file. The first reprimand came on June 8, 2009, and the reprimands continued for over two years.[2] In addition to the reprimands, Kilpatrick recommended Gibson's termination to the Board on several occasions, including for insubordination, lack of visibility in the community, and failure to work an adequate number of hours.

On December 1, 2010, Gibson brought this action in federal court against Kilpatrick in his individual capacity, alleging violations of his First Amendment right to free expression under 42 U.S.C. § 1983, and malicious interference with employment and intentional infliction of emotional distress under Mississippi law. Less than a year later, on October 5, 2011, the Board voted to terminate Gibson's employment. Gibson subsequently amended his complaint to add the City of Drew as a defendant, alleging that the city violated his First Amendment rights in retaliation for his filing suit against Kilpatrick.

---

[2] The record contains nine different reprimands of Gibson from Kilpatrick over this period for, inter alia, Gibson's tardiness to a meeting because he was driving to the emergency room for medical care; assisting a neighboring police department with a domestic violence stand-off without first obtaining prior approval from the Board; holding a staff meeting that caused the city to incur overtime payments; and allowing citizens to play basketball in the new community center after the Board had approved the center's use for a luncheon for city employees.

3

No. 12-60905

Kilpatrick and the City of Drew jointly moved for summary judgment on Gibson's First Amendment and state law claims.[3]  Kilpatrick asserted that he was entitled to qualified immunity as to the First Amendment claim because Gibson's speech was not constitutionally protected nor were Kilpatrick's actions objectively unreasonable.  As for the state law claims, Kilpatrick and the City of Drew argued that Gibson failed to file a notice of claim in compliance with the Mississippi Tort Claims Act ("MTCA"), so the claims were barred.  *See* Miss. Code Ann. § 11-46-11 (2013).  The court "reserved judgment" as to whether Kilpatrick had violated Gibson's constitutional rights and whether Kilpatrick was entitled to qualified immunity; however, it entered judgment in the defendants' favor with respect to the state law tort claims.  Kilpatrick moved for reconsideration of his qualified immunity defense, and the court held that Kilpatrick was not entitled to qualified immunity because Gibson's speech was protected under the First Amendment and the right was clearly established.

Kilpatrick timely appealed the district court's summary judgment and reconsideration orders.  Gibson timely cross-appealed the district court's dismissal of his state law tort claim for malicious interference with employment. Kilpatrick moved to dismiss the cross-appeal for lack of jurisdiction, and the court ordered that motion to be carried with the case.

## II. Qualified Immunity

### A. Standard of Review

Typically, a party may not immediately appeal a district court's decision to deny summary judgment, but the denial of a motion for summary judgment based on qualified immunity is a collateral order capable of immediate review. *Brown v. Strain*, 663 F.3d 245, 248 (5th Cir. 2011).  This court has jurisdiction

---

[3] The district court denied summary judgment as to both Kilpatrick and the City of Drew.  Since the City of Drew is not party to this appeal, we do not address the municipal liability claim.

over such an order only "to the extent that the district court's order turns on an issue of law." *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010). We may not review a district court's decision to deny qualified immunity based on evidentiary sufficiency on an interlocutory appeal, because such a determination is not considered a "final decision." *Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Gobert v. Caldwell*, 463 F.3d 339, 344 (5th Cir. 2006). This court "consider[s] only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004) (en banc). "Where factual disputes exist in an interlocutory appeal asserting qualified immunity, we accept the plaintiffs' version of the facts as true." *Id.* "In reviewing the district court's conclusions concerning the legal consequences—the materiality—of the facts, our review is of course *de novo*." *Id.* at 349.

## B. Discussion

To rebut a defendant's qualified immunity defense, the plaintiff must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citation omitted). A court may consider either prong of the qualified immunity analysis first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We begin by addressing the first prong— whether Kilpatrick's reprimands violated Gibson's First Amendment right to free expression.

The Supreme Court has long held that government employees are not stripped of their right to freedom of expression by virtue of their employment. *Connick v. Myers*, 461 U.S. 138, 142 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). This right is not absolute, though, and we utilize a four-pronged test to determine whether the speech of a public employee is entitled to constitutional protection. *See Juarez v. Aguilar*, 666 F.3d 325, 332 (5th Cir.

2011).  A plaintiff must establish that: (1) he suffered an adverse employment decision; (2) his speech involved a matter of public concern; (3) his interest in speaking outweighed the governmental defendant's interest in promoting efficiency; and (4) the protected speech motivated the defendant's conduct.  *Id.* (citations omitted).    In 2006, the Supreme Court added what we have characterized as a "threshold layer" to the second prong of the retaliation test. *See Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) (describing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)).  Under this prong, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti*, 547 U.S. at 421. While the court must consider factual circumstances to determine whether speech is official, the determination is still a question of law.  *Charles v. Grief*, 522 F.3d 508, 513 n.17 (5th Cir. 2008).  Functionally, this threshold layer has transformed our test, inserting an additional prong at which we consider whether the speech was pursuant to the employee's duties or as a citizen.

In this case, our analysis begins and ends at this new prong.[4]  Because

---

[4] Kilpatrick also argues that a reprimand is not an adverse employment action under the first prong.  We assume without deciding that a reprimand is an adverse employment action for the purposes of a § 1983 claim.  While the Supreme Court has clarified that, under Title VII, a plaintiff must prove that a reasonable employee would have found the alleged adverse employment action "materially adverse," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), this court has not yet decided whether the *Burlington* standard for adverse employment actions also applies to First Amendment retaliation cases, *see DePree v. Saunders*, 588 F.3d 282, 288 (5th Cir. 2009) (explaining that this circuit has not "formally applied *Burlington* to First Amendment retaliation claims").  As for the third prong, Kilpatrick did not challenge that in the district court, but the district court conducted a balancing of the parties' interests and concluded that they favored Gibson.  Kilpatrick does not raise this prong in his appeal. Regarding the fourth prong, Kilpatrick asserts that there are insufficient facts in the record to show that the speech motivated his conduct.  We lack jurisdiction to consider Kilpatrick's arguments regarding the fourth prong, since issues regarding the sufficiency of evidence are factual issues that may not be considered in an interlocutory appeal.  *See Gobert*, 463 F.3d at 344.

No. 12-60905

Gibson's report to law enforcement agencies was official speech, we must reverse.

We turn first to the source of this new prong—*Garcetti*. In *Garcetti*, a deputy district attorney reviewed an affidavit supporting a search warrant and concluded that the affidavit contained misrepresentations. *See* 547 U.S. at 413–14, 421. The attorney reported his concerns to his supervisors and provided one with a memorandum. *Id.* at 414. The supervisors held a meeting on the matter, but they decided to proceed with the prosecution despite the attorney's concerns. *Id.* The defense moved to challenge the warrant and called the attorney to testify at the hearing regarding his observations. *Id.* at 414–15. The attorney complied, allegedly prompting retaliation from his supervisors. *Id.*

The Supreme Court concluded that the First Amendment did not shield the attorney's speech from discipline. The Court began its analysis by clarifying which facts were *not* dispositive. The fact that the attorney "expressed his views inside his office, rather than publicly," did not render his speech unprotected, since "[m]any citizens do much of their talking inside their respective workplaces." *Id.* at 420. Likewise, the fact that the "memo concerned the subject matter of [the attorney's] employment . . . is nondispositive. The First Amendment protects some expressions related to the speaker's job." *Id.* at 421 (citations omitted). Ultimately, "the controlling factor . . . [was] that his expressions were made pursuant to his duties as calendar deputy." *Id.* As a calendar deputy, it was his duty to advise his supervisors about how to proceed with prosecutions, and the investigation of charges and preparation of memoranda were part of his "daily professional activities."[5] *Id.* at 421–22.

While *Garcetti* clearly added an additional inquiry into our freedom of

---

[5] The Supreme Court was not required to review findings of fact as to the scope of the attorney's professional duties since it was undisputed that the attorney produced the memorandum pursuant to his duties as a prosecutor. *Garcetti*, 547 U.S. at 421.

expression analysis, the Court "did not explicate what it means to speak pursuant to one's official duties, although we do know that a formal job description is not dispositive . . . [,] nor is speaking on the subject matter of one's employment." *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) (per curiam) (internal citations and quotation marks omitted) (hereinafter "*Williams*"). The Supreme Court acknowledged that *Garcetti* did not "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate," thus signaling that lower courts must flesh out the distinction between official and citizen speech. 547 U.S. at 424. We have since undertaken this task.

In *Williams*, we considered whether a memorandum sent by a school athletic director to a school principal about the misuse of athletic funds was official speech. 480 F.3d at 689–94. It was undisputed that the director was not required to write memoranda as part of his regular job duties, but we nonetheless held that his speech was made pursuant to his official duties. *Id.* at 693. We reasoned that "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties." *Id.* The memorandum concerned matters immediately within his purview as the athletic director—the use of funds for the school athletic teams and the related accounting procedures. Thus, the speech was made as part of his official duties. *Id.* at 694.

A year later, in *Davis*, we held that an information systems auditor spoke pursuant to her official duties and as a citizen when she sent a complaint letter to her supervisors and to the Chancellor of the University of Texas. 518 F.3d at 307–16. Davis worked for the university, and she conducted an audit of university computers and discovered pornography. 518 F.3d at 307–08. Davis approached various administrators to address the issue, but she considered their response to be inadequate. *Id.* at 308–09. She sent a complaint letter to her immediate supervisors and to the Chancellor, in which she noted that she had

also filed complaints with the FBI regarding possible child pornography and the EEOC about workplace discrimination. *Id.* at 309, 314. Since Davis's complaints to the FBI and EEOC were clearly made outside of the chain of command, and since her duties as an auditor did not require that she communicate with law enforcement, we held that the complaints constituted citizen speech. *Id.* at 316.

Deciding whether the speech in the letter was made pursuant to Davis's official duties required more careful deliberation since the letter discussed multiple topics and had multiple recipients. *Id.* at 314. We considered additional factors, including the relationship between the speech and the employee's job, whether the speech was made within the employee's chain of command, and whether the speech stemmed from special knowledge the employee gained as a result of the employee's position. *Id.* A portion of Davis's letter discussed the "inadequate response to her investigation of employees accessing pornography," which we held amounted to official speech since it involved work that she had performed as part of her duties. *Id.* at 315–16. However, the remainder of the letter addressed university-wide discrimination, favoritism, and the compensation of executives, which constituted citizen speech since it did not concern Davis's duties as an auditor. *Id.* at 316.

In addition to our own precedent, Kilpatrick urges us to adopt the reasoning of the Ninth Circuit in *Huppert v. City of Pittsburg*, 574 F.3d 696 (9th Cir. 2009), and apply it to Gibson's speech. *Huppert* relied on a 1939 California appellate court decision to conclude, as a matter of law, that a police officer acted pursuant to his official duties in cooperating with the FBI and testifying before a grand jury. *Id.* at 706–10 (relying on *Christal v. Police Comm'n of City and Cnty. of S.F.*, 92 P.2d 416 (Cal. Dist. Ct. App. 1939)). Kilpatrick advocates for this analysis and argues that we may rely on Mississippi's statutory definition

of a law enforcement officer to define Gibson's official duties as the Chief of Police.[6]

In a recent en banc decision, the Ninth Circuit overruled *Huppert* "to the extent that it improperly relied on a generic job description and failed to conduct the 'practical,' fact-specific inquiry required by *Garcetti*." *Dahlia v. Rodriguez*, — F.3d —, 2013 WL 4437594, at \*7 (9th Cir. Aug. 21, 2013) (en banc). *Garcetti* clearly warned against the use of a written job description to define an employee's duties, explaining that

> Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Garcetti*, 547 U.S. at 424–25. The Court was concerned that the use of a written job description might lead to "employers . . . [restricting] employees' rights by creating excessively broad job descriptions." *Id.* at 424. In *Dahlia*, the Ninth Circuit held that *Huppert*'s reliance on "a broad court-created job description applicable to every member of a profession" was equally as problematic as relying on an employer-created job description. 2013 WL 4437594, at \*7.

Yet, *Huppert*'s analysis raises a pertinent question—to what extent should a court consider statutory duties of a police officer in identifying the scope of his or her official duties? *Garcetti* was concerned with courts limiting their analysis to the written description of an occupation, divorced from the actual function of the employee. We have since interpreted *Garcetti*'s language as proscribing our exclusive reliance on an employer's written description of duties when

---

[6] Mississippi law defines a law enforcement officer, which Gibson undoubtedly was, as "any person . . . whose primary responsibility is the prevention and detection of crime, the apprehension of criminals[,] and the enforcement of the criminal and traffic laws of this state and/or the ordinances of any political subdivision thereof." Miss. Code Ann. § 45-6-3(c).

evaluating the merits of a First Amendment retaliation claim. *See Williams v. Riley*, 275 F. App'x 385, 389 (5th Cir. 2008) (unpublished) (per curiam) (hereinafter "*Riley*"). In *Riley*, jailers at a sheriff's office reported their supervisor's abuse of an inmate. *Id.* at 387. The only facts in the record concerning the jailers' duty to report incidents of force came from a policy manual; outside of the manual, the job duties of the jailers were "scarcely mentioned." *Id.* at 389. We could have "presumed that an employee's official job duties at a reasonable sheriff's department would include reporting crimes perpetrated at work by department members," but the record did not actually include such facts, so we remanded the case for further proceedings. *Id.* at 389–90.

*Riley* does not completely preclude the use of written job descriptions in a First Amendment inquiry. In *Davis*, we expressly considered a university memorandum that outlined the reporting procedures to be used by auditors in order to understand Davis's duty to report as well as the chain of command. 518 F.3d at 316. Unlike *Riley*, the record contained additional facts concerning the duties of auditors, so our analysis was not limited to the policy memorandum. The memorandum was important to our determination that some of the speech in Davis's letter to the Chancellor was official, thus showing that there is a proper place for the use of written descriptions of duties in a First Amendment retaliation analysis. *Id.*

We decline to rely exclusively on a statutory description of a generic law enforcement officer to determine the scope of a specific police officer's official duties. However, we do not exclude written descriptions of duties or statutory definitions from our analysis. In order to heed *Garcetti*'s admonition against solely relying on the written description of an individual's occupation, we will consider Mississippi's statutory language, viewing it as one factor among many. This is consistent with our holding in *Davis*.

No. 12-60905

Turning now to the present matter, the district court concluded that Gibson had shown that Kilpatrick violated his First Amendment rights, and in so doing, explained that under *Davis*, Gibson's reports constituted citizen speech. The court supported this legal conclusion with the following facts: (1) Gibson reported his suspicions to agencies outside of his chain of command; (2) there was no evidence to show that Gibson's duties included making reports to the FBI or DEA; and (3) there was a lack of evidence regarding the context in which Gibson reported his suspicions other than that the reports were confidential.[7] These facts make this case superficially resemble this court's decision in *Davis*.

However, Gibson's speech is complicated by additional factors not fully discussed by the district court. Although Gibson's precise job description is not contained in the record, we can consider surrounding facts to determine whether his speech is related to any conceivable job duties. *See Charles*, 522 F.3d at 514. The circumstances surrounding the incident, from how Gibson learned of the misuse of the gasoline card to his involvement in the investigation, speak volumes about his actual duties as the Chief of Police. First, Kilpatrick's use of the city gasoline card was brought to Gibson's attention through a subordinate. The fact that the complaint came to him in a professional capacity and through the chain of command reveals that managing and responding to allegations of the misuse of civic funds was likely within the scope of his employment. *See Davis*, 518 F.3d at 313 (citing *Williams*, 480 F.3d at 694) (considering whether the speech reflects a "special knowledge" gained by virtue of one's employment); *see also Briscoe v. Jefferson Cnty.*, 500 F. App'x 274, 278 (5th Cir. 2012) (unpublished) (per curiam) (holding that the appellant's use of her "special

---

[7] The district court also held that, in the absence of evidence regarding Gibson's duties, he was "more likely involved [in] responding to complaints from private citizens than making them himself." However, this is speculation, and not based on facts in the record. We may not base our decisions on presumptions, regardless of how logical they may be. *See Riley*, 275 F. App'x at 389.

12

knowledge" of a record-keeping policy in order to substantiate a complaint is a factor indicating that her speech was official).

Second, Gibson's decision to report to agencies outside of his chain of command does not necessarily show that he spoke as a citizen. Given his position, there was arguably no one else to whom Gibson could confidentially report the information. Gibson was the "chief law enforcement officer," *see* Miss. Code Ann. § 21-21-1, and according to the district court's findings of fact, the only entities to which he could have reported within the chain of command were Kilpatrick and the Board. Reporting to Kilpatrick—the suspected perpetrator—clearly was undesirable, while reporting to the Board might have required public disclosure of Gibson's suspicions, perhaps endangering the subsequent investigation. Indeed, it appears that once Board members learned of the investigation, one of them informed Kilpatrick. The state agencies Gibson contacted may well have been the most appropriate entities to receive the information, a fact other courts have found instructive. *See Patterson v. City of Earlington*, 650 F. Supp. 2d 674, 680 (W.D. Ky. 2009) (holding that a police chief's report of a mayor's alleged election law violations to state police is not protected because state police were the most appropriate authority to carry out the investigation); *Mantle v. City of Country Club Hills*, No. 4:07-CV-55 (CEJ), 2008 WL 3853432, at *4 (E.D. Mo. Aug. 15, 2008) (holding that a police chief's report of a mayor's criminal conduct to a municipal court judge is not protected because the police chief had no departmental supervisor and the judge was the most appropriate authority to whom he could report).[8]

---

[8] Kilpatrick argues that Gibson's decision to contact individuals at the FBI and DEA with whom he had previously worked indicates that he went through professional channels to make the report. However, this is unpersuasive. Gibson could have contacted these individuals because he had a personal relationship with them by virtue of the fact that they met while working together, which would indicate that the speech was private. It is also possible that these were the only people that Gibson could contact due to a limited regional presence of these federal agencies. We simply do not know. Since there is little evidence as

Third, it appears that Gibson was able to monitor Kilpatrick's use of the gasoline card only because Kilpatrick was required to come to the police department to collect it. Gibson fully took advantage of the authority afforded to him as Chief of Police, and he instructed his police officers to participate in the investigation by monitoring Kilpatrick's activities; he even sent a copy of the official police logs to the OSA. Although Gibson does not allege that his participation in the investigation is protected, we consider his involvement because it reflects his actual authority and ability to investigate and detect crime. It supports our conclusion that Gibson was acting as a law enforcement officer doing his job, not as a private citizen fulfilling his civic duty.

Finally, Mississippi law reinforces what the facts surrounding the investigation show—that his "primary responsibility [was] the prevention and detection of crime . . . [and] the apprehension of criminals." *See* Miss. Code Ann. § 45-6-3(c). Gibson, as Chief of Police, was the City of Drew's "chief law enforcement officer" and had "control and supervision of all police officers employed by" the city. *Id.* § 21-21-1. While we are not exclusively relying on the statute's definition to understand the duties of the Chief of Police, the statute weighs in favor of finding Gibson's speech as part of his professional responsibilities.

Gibson's argument that reporting illegal activity is the duty of all citizens, and therefore must constitute protected citizen speech, does not alter our conclusion. *See Garcetti*, 547 U.S. at 419 ("So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."). Other courts have rightly rejected similar arguments. In particular, the D.C. Circuit in *Bowie v. Maddox* stated that:

---

to how Gibson knew these individuals and why he contacted them, we cannot say that this fact weighs in favor of either official or citizen speech.

14

No. 12-60905

> The critical question under *Garcetti* is not whether the speech at issue has a civilian analogue, but whether it was performed "pursuant to . . . official duties." A test that allows a First Amendment retaliation claim to proceed whenever the government employee can identify a civilian analogue for his speech is about as useful as a mosquito net made of chicken wire: [a]ll official speech, viewed at a sufficient level of abstraction, has a civilian analogue.

653 F.3d 45, 48 (D.C. Cir. 2011) (citations omitted). Gibson's argument functionally reads an unsupported exception into *Garcetti*'s holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. He would reverse this language, and instead of looking to whether statements were made as part of an employee's official duties, he would ask only whether the speech could be classified as citizen speech and, if so, end the inquiry. This is not *Garcetti*'s holding. *See Bowie*, 653 F.3d at 48.

Gibson acted as the Chief of Police when he contacted various federal and state law enforcement agencies to report misuse of the city gasoline card. Because we conclude that Gibson acted pursuant to his official job duties in making the reports, we need not consider the remaining prongs of the First Amendment retaliation test, since he cannot show that Kilpatrick violated his First Amendment rights. In the absence of such a showing, Gibson cannot overcome Kilpatrick's qualified immunity defense. Thus, the district court erred in denying Kilpatrick's motion for summary judgment premised on qualified immunity, and we reverse.

## III. Motion to Dismiss

The district court dismissed Gibson's tort claims without prejudice for failure to comply with the MTCA notice requirement. Gibson cross-appeals, arguing that the district court erred in dismissing his malicious interference with employment claim, but he does not appeal the dismissal with respect to his

15

other tort claims.   Kilpatrick moved to dismiss this appeal for want of jurisdiction.  We agree.  *See Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 565 (5th Cir. 2003) (declining to exercise pendent appellate jurisdiction over a state law tort claim in an interlocutory appeal of the district court's order denying qualified immunity).   Accordingly, we grant Kilpatrick's motion to dismiss Gibson's cross-appeal for lack of jurisdiction.

## IV. Conclusion

For the foregoing reasons, we REVERSE the district court's order denying Kilpatrick's motion for summary judgment based on qualified immunity and GRANT the motion to dismiss Gibson's cross-appeal for lack of jurisdiction. Finally, we REMAND the case to the district court for further proceedings consistent with this opinion.  Gibson shall bear the costs of this appeal.