**REVISED January 2, 2015**
# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-60905

United States Court of Appeals
Fifth Circuit

**FILED**

December 11, 2014

Lyle W. Cayce
Clerk

ANTHONY GIBSON,

  Plaintiff-Appellee Cross-Appellant

v.

JEFFREY KILPATRICK, in His Individual Capacity,

  Defendant-Appellant Cross-Appellee

Appeals from the United States District Court
for the Northern District of Mississippi

ON REMAND FROM THE UNITED STATES SUPREME COURT

Before STEWART, Chief Judge, KING, and PRADO, Circuit Judges.

KING, Circuit Judge:

The Supreme Court has vacated the judgment in this case and remanded for further consideration in light of *Lane v. Franks*, 573 U.S. ---, 134 S. Ct. 2369 (2014). While serving as the Chief of Police in Drew, Mississippi, Anthony Gibson reported Mayor Jeffrey Kilpatrick to outside law enforcement agencies for misuse of the city gasoline card. Months later, Kilpatrick began issuing written reprimands to Gibson for a panoply of alleged deficiencies. Gibson subsequently filed a lawsuit alleging unconstitutional retaliation as well as state tort law claims. Kilpatrick moved for summary judgment, raising the

defense of qualified immunity and arguing that the state tort law claims were barred because Gibson failed to comply with state notice requirements. The district court denied the motion with respect to qualified immunity, but granted it with respect to the state tort claims. Kilpatrick now brings this interlocutory appeal of the district court's order denying qualified immunity, and Gibson cross-appeals the district court's dismissal of one of his tort claims. Kilpatrick moves to dismiss the cross-appeal for lack of jurisdiction. We hold that Kilpatrick is entitled to qualified immunity and reverse the district court's order to the extent that it denied qualified immunity. Additionally, because we lack jurisdiction to hear Gibson's cross-appeal, we grant Kilpatrick's motion to dismiss the cross-appeal.

## I. Factual and Procedural Background

In 2006, Anthony Gibson applied to be Chief of Police in Drew, Mississippi. Mayor Jeffrey Kilpatrick opposed Gibson's application and supported another candidate. The city's Board of Aldermen ("Board") rejected Kilpatrick's recommendation and hired Gibson in August 2006. As Chief of Police, Gibson reported directly to Kilpatrick and the Board.

Sometime within the first four months of Gibson's employment, a subordinate at the police department informed Gibson that Kilpatrick was misusing the city gasoline card to fuel his vehicle for personal trips. Gibson confidentially reported his suspicions to the Federal Bureau of Investigation ("FBI"), Drug Enforcement Administration ("DEA"),[1] Mississippi Office of the State Auditor ("OSA"), and Mississippi Attorney General's Office. His reports to the FBI and DEA were through contacts with whom he had worked in an official capacity on prior occasions. The OSA initiated an investigation, and

---

[1] Gibson heard rumors that Kilpatrick might be involved in illicit drugs; however, this allegation was never investigated or substantiated. It did prompt his decision to contact the DEA.

No. 12-60905

Gibson worked with Investigator Karen Swain to assist in the OSA's efforts. Because Kilpatrick had to come to the police department to obtain the gasoline card, Gibson was able to monitor Kilpatrick's activities. Gibson instructed two police dispatchers to make log entries every time Kilpatrick asked to use the card, and he ordered a police officer to observe Kilpatrick following receipt of the card. Gibson and Swain also directed the city clerk to monitor receipts from Drew's gasoline provider to compare them with the information recorded in the log. In September 2008, the investigation concluded, finding that Kilpatrick had misused the city gasoline card, and the OSA ordered Kilpatrick to repay approximately $3,000 to the City of Drew for his unauthorized use of the card.

Approximately nine months after the conclusion of the investigation, Kilpatrick began entering written reprimands into Gibson's personnel file. The first reprimand came on June 8, 2009, and the reprimands continued for over two years.[2] In addition to the reprimands, Kilpatrick recommended Gibson's termination to the Board on several occasions, including for insubordination, lack of visibility in the community, and failure to work an adequate number of hours.

On December 1, 2010, Gibson brought this action in federal court against Kilpatrick in his individual capacity, alleging violations of his First Amendment right to free expression under 42 U.S.C. § 1983, and malicious interference with employment and intentional infliction of emotional distress

---

[2] The record contains nine different reprimands of Gibson from Kilpatrick over this period for, *inter alia*, Gibson's tardiness to a meeting because he was driving to the emergency room for medical care; assisting a neighboring police department with a domestic violence stand-off without first obtaining prior approval from the Board; holding a staff meeting that caused the city to incur overtime payments; and allowing citizens to play basketball in the new community center after the Board had approved the center's use for a luncheon for city employees.

3

under Mississippi law.  Less than a year later, on October 5, 2011, the Board voted to terminate Gibson's employment.  Gibson subsequently amended his complaint to add the City of Drew as a defendant, alleging that the city violated his First Amendment rights in retaliation for his filing suit against Kilpatrick.

Kilpatrick and the City of Drew jointly moved for summary judgment on Gibson's First Amendment and state law claims.  Kilpatrick asserted that he was entitled to qualified immunity as to the First Amendment claim because Gibson's speech was not constitutionally protected nor were Kilpatrick's actions objectively unreasonable.  As for the state law claims, Kilpatrick and the City of  Drew argued that Gibson failed to file a notice of claim in compliance with the Mississippi Tort Claims Act ("MTCA"), so the claims were barred.  *See* Miss. Code Ann. § 11-46-11 (2013).  The court "reserved judgment" as to whether Kilpatrick had violated Gibson's constitutional rights and whether Kilpatrick was entitled to qualified immunity; however, it entered judgment in the defendants' favor with respect to the state law tort claims.  Kilpatrick moved for reconsideration of his qualified immunity defense, and the court held that Kilpatrick was not entitled to qualified immunity because Gibson's speech was protected under the First Amendment and the right was clearly established.

Kilpatrick timely appealed the district court's summary judgment and reconsideration orders.  Gibson timely cross-appealed the district court's dismissal of his state law tort claim for malicious interference with employment.  Kilpatrick moved to dismiss the cross-appeal for lack of jurisdiction, and the court ordered that motion to be carried with the case.

After we issued our opinion in this case, *Gibson v. Kilpatrick*, 734 F.3d 395 (5th Cir. 2013), the Supreme Court decided *Lane*, vacated our judgment, and remanded for further consideration in light of that opinion, *Gibson v. Kilpatrick*, 134 S. Ct. 2874, 2874 (2014) (mem.).

No. 12-60905

## II. Qualified Immunity

### A. Standard of Review

Typically, a party may not immediately appeal a district court's decision to deny summary judgment, but the denial of a motion for summary judgment based on qualified immunity is a collateral order capable of immediate review. *Brown v. Strain*, 663 F.3d 245, 248 (5th Cir. 2011). This court has jurisdiction over such an order only "to the extent that the district court's order turns on an issue of law." *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010). We may not review a district court's decision to deny qualified immunity based on evidentiary sufficiency on an interlocutory appeal, because such a determination is not considered a "final decision." *Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Gobert v. Caldwell*, 463 F.3d 339, 344 (5th Cir. 2006). This court "consider[s] only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004) (en banc). "Where factual disputes exist in an interlocutory appeal asserting qualified immunity, we accept the plaintiffs' version of the facts as true." *Id.* "In reviewing the district court's conclusions concerning the legal consequences—the materiality—of the facts, our review is of course *de novo*." *Id.* at 349.

### B. Discussion

To rebut a defendant's qualified immunity defense, the plaintiff must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citation omitted). A court may consider either prong of the qualified immunity analysis first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We begin and end by addressing the

No. 12-60905

second prong—whether Kilpatrick's reprimands violated Gibson's clearly established First Amendment rights.

Determining whether a public employee's speech is protected by the First Amendment involves a two-step inquiry. *Lane v. Franks*, 573 U.S. ---, 134 S. Ct. 2369, 2378 (2014). The first step requires the court to determine whether the employee spoke as a citizen on a matter of public concern. *Id.* If he did, the second step requires the court to determine whether the government employer had a constitutionally sufficient justification for punishing the employee for his speech by balancing the interest in allowing the speech against the interest in penalizing it. *Id.*; *Pickering v. Bd. of Educ. of Twp. High School Dist. 205, Will Cnty.*, 391 U.S. 563, 574–75 (1968); *Connick v. Myers*, 461 U.S. 138, 150–51 (1983).

The first step of the analysis subtly sets out two predicates for public-employee speech to receive First Amendment protection; the speech must be made *as a citizen* and on *a matter of public concern*. It is the first requirement—that the public employee speak as a citizen—that is dispositive here.

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court made clear that the "as a citizen" requirement draws a distinction between when public employees speak in their private capacities and when they speak "pursuant to their official duties." *Garcetti*, 547 U.S. at 421. When public employees speak "pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

Yet despite its enunciation of that rule of law, the Supreme Court had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.* at 424. The Court did state, however, that job descriptions are not dispositive, *id.*

No. 12-60905

at 424–25, that the fact that speech concerns the subject matter of employment is not dispositive, *id.* at 421, and that whether the employee expresses himself in the office is not dispositive, *id.* at 420. Rather, "the proper inquiry is a practical one," and it focuses solely on whether the speech was performed "within the scope of the employee's professional duties." *Id.* at 424–25.

Now the Supreme Court has once again spoken on this issue, in *Lane v. Franks*, 573 U.S. ---, 134 S. Ct. 2369 (2014), and this case has been remanded to us for reconsideration in its wake. In *Lane*, an administrator of a state program reported an employee—who was also an Alabama state legislator—for collecting pay for hours she had not worked. *Lane*, 134 S. Ct. at 2375. After meeting with the legislator, Lane ordered her to show up for the hours she had promised to work, and, when she did not, he fired her. *Id.* The legislator's termination drew the attention of the FBI, and a federal prosecution began. *Id.* Lane was subpoenaed to testify before a federal grand jury and did so. *Id.* He was fired shortly thereafter and sued, alleging that he was retaliated against for his testimony before the grand jury. *Id.* at 2376. The Eleventh Circuit held that *Garcetti* precluded Lane's claim because Lane learned the information in his testimony through his employment and therefore he spoke pursuant to his official duties. *Id.* at 2376–77. The Supreme Court reversed, holding that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes." *Id.* at 2378. The Court reiterated that the mere fact that speech concerns information that was learned through public employment does not remove the speech from the ambit of First Amendment protection. *Id.* at 2379.

*Lane* seems to us to be an application of prior Supreme Court precedent. It was, after all, undisputed in *Lane* that "Lane's ordinary job responsibilities did not include testifying in court proceedings." *Id.* at 2378 n.4. *Garcetti* had indicated that the mere fact that speech concerns information learned while

performing official job duties does not preclude First Amendment protection. *Garcetti*, 547 U.S. at 421 ("The memo concerned the subject matter of Ceballos' employment, but this, too, is nondispositive."). More fundamentally, the Court's reasoning in *Pickering* indicated that the high value of public employees' contributions to civic discourse often derives from the knowledge they gain from their public employment, *Pickering*, 391 U.S. at 572 ("Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allocated to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal."), a premise that was reiterated in *Garcetti*, 547 U.S. at 421. Given that precedent, *Lane* does not appear to have altered the standard for whether public employees speak pursuant to their official duties, but appears rather to be an application of *Garcetti*'s rule. Yet three aspects of the *Lane* opinion merit discussion, as they appear to offer the prospect of new law. The first is *Lane*'s injection of the word "ordinary" into the "pursuant to official duties" test. *Compare Lane*, 134 S. Ct. at 2378 ("Truthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes."), *with Garcetti*, 547 U.S. at 421 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). The second is *Lane*'s discussion of the importance of public-employee speech in ferreting out public corruption. The third is *Lane*'s discussion of the affirmative legal obligation to testify truthfully in reasoning that the speech at issue was speech as a citizen. We discuss each in turn.

We begin with the formulation "ordinary job duties," which *Lane* has inserted into the *Garcetti* rule. *Lane*, 134 S. Ct. at 2378. Much of the treatment

8

of *Lane* thus far has speculated that the insertion of "ordinary" may signal a narrowing of the Supreme Court's position on *Garcetti*'s coverage. *See, e.g.*, *Mpoy v. Rhee*, 758 F.3d 285, 295 (D.C. Cir. 2014) ("In particular, the use of the adjective 'ordinary'—which the court repeated nine times—could signal a narrowing of the realm of employee speech left unprotected by *Garcetti*."); *Hagan v. City of N.Y.*, --- F. Supp. 2d ---, No. 13-cv-1108 (JPO), 2014 WL 4058067, at *21 (S.D.N.Y. Aug. 15, 2014) ("First, *Garcetti*'s 'pursuant to official duties' standard remains good law. However, it must be understood in light of *Lane*'s 'ordinary job responsibilities' standard, which the court repeatedly used in lieu of *Garcetti*'s more cryptic language." (internal citations omitted)). Whatever may come of *Lane*'s use of the "ordinary" modifier, at this point it likely has not altered the rule in *Garcetti*, at least not in any way that can be said to be clearly established. It was undisputed in *Lane* that the employee had not spoken pursuant to his official duties. *See Lane*, 134 S. Ct. at 2378 n.4 ("It is undisputed that Lane's ordinary job responsibilities did not include testifying in court proceedings."); *id.* at 2383 (Thomas, J., concurring) ("The petitioner in this case did not speak 'pursuant to' his ordinary job duties because his responsibilities did not include testifying in court proceedings, and no party has suggested that he was subpoenaed as a representative of his employer. Because petitioner did not testify to 'fulfill a work responsibility,' he spoke 'as a citizen,' not as an employee." (internal brackets and citations omitted) (quoting *Garcetti*, 547 U.S. at 421)). As such, there was no occasion for the Court to refine the standard for determining when an employee speaks pursuant to his official duties. Therefore, whatever change in the jurisprudence "ordinary" may augur, we are unable to discern any change in *Garcetti*'s rule from *Lane* applicable to this case, for any change resulting from *Lane* cannot be said to have been "'clearly established' *at the time of the challenged conduct*." *Al-Kidd*, 131 S. Ct. at 2080 (emphasis added).

No. 12-60905

Second, we turn to *Lane*'s discussion of the context of public corruption and its impact on whether the speech in that case was protected by the First Amendment. *Lane*'s discussion of whether the plaintiff spoke as a citizen or as an employee concludes by addressing the necessity of public-employee whistleblowing in stemming public corruption:

> The importance of public employee speech is especially evident in the context of this case: a public corruption scandal. The United States, for example, represents that because "[t]he more than 1000 prosecutions for federal corruption offenses that are brought in a typical year ... often depend on evidence about activities that government officials undertook while in office," those prosecutions often "require testimony from other government employees." Brief for United States as Amicus Curiae 20. It would be antithetical to our jurisprudence to conclude that the very kind of speech necessary to prosecute corruption by public officials—speech by public employees regarding information learned through their employment—may never form the basis for a First Amendment retaliation claim. Such a rule would place public employees who witness corruption in an impossible position, torn between the obligation to testify truthfully and the desire to avoid retaliation and keep their jobs.

*Lane*, 134 S. Ct. at 2380. We doubt that this discussion means that speech is "as a citizen" whenever public corruption is involved, as that could conflict with the opinion in *Garcetti*. *See Garcetti*, 547 U.S. at 425–26 (stating that the exposure of governmental inefficiency and misconduct must be enforced through other laws and constitutional provisions than the First Amendment when dealing with public employees speaking pursuant to their official duties). Rather, the passage must be read in the context of *Lane*'s facts and in light of *Lane*'s statement that the opinion does "not address in this case whether truthful sworn testimony would constitute citizen speech under *Garcetti* when given as part of a public employee's ordinary job duties." *Lane*, 134 S. Ct. at 2378 n.4. In *Lane*, it was undisputed that the employee was not speaking as part of his ordinary job duties. *Id.* The testimony of public-employees is

frequently necessary to prosecute public corruption. But it cannot be said to be strictly necessary that they be speaking *pursuant to their official duties* when they testify in order to prosecute public corruption. As such, it cannot be said that *Lane*'s discussion of public corruption alters *Garcetti* in a way that is clearly established for purposes of this case.

Lastly, we must confront *Lane*'s discussion of the legal obligation to testify truthfully and its relation to classifying speech as citizen-speech. In *Lane*, the Court held that a public-employee's testimony before a grand jury was citizen speech "for a simple reason: Anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth." *Lane*, 134 S. Ct. at 2379. The Court noted that any "obligations as an employee are distinct and independent from the obligation, as a citizen, to speak the truth." *Id.* *Lane* thus relied upon an independent legal obligation to tell the truth. *See id.* (citing "18 U.S.C. § 1623 (criminalizing false statements under oath in judicial proceedings)" and "*United States v. Mandujano*, 425 U.S. 564, 576 (1976) (plurality opinion) ('Perjured testimony is an obvious and flagrant affront to the basic concept of judicial proceedings')"). Citing this discussion in *Lane*, Gibson points to 18 U.S.C. § 4 and *Roberts v. United States*, 445 U.S. 552, 557–58 (1980), as establishing a similar duty of citizens to affirmatively report crime. But any such independent legal obligation is only relevant if Gibson was speaking pursuant to his official duties; otherwise, his speech would be outside of *Garcetti*'s ambit regardless. And, fatally, if Gibson was speaking pursuant to his official duties and was under an independent legal obligation as a citizen to report crime, it would raise the question that *Lane* expressly declined to answer, that is, whether there are obligations as a citizen that preempt obligations as an employee for First Amendment purposes. *Lane*, 134 U.S. at 2378 n.4 ("We accordingly need not address in this case whether truthful sworn testimony would constitute citizen speech under *Garcetti* when

No. 12-60905

given as part of a public employee's ordinary job duties, and express no opinion on the matter today."). As such, we could not say that such a right was "clearly established" at the time Gibson was allegedly retaliated against.

Therefore, we turn to the central issue—whether Gibson was acting pursuant to his official duties in reporting Kilpatrick's use of the gas card to outside agencies.

In making that inquiry, one of the factors that we have considered is whether the employee's complaint was made within the chain of command or to an outside actor, such as a different government agency or the media. *See Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008). In *Davis*, we noted that if "a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen." *Id.* Yet that is only *ordinarily* the case, as no single fact or factor is dispositive. There is no heuristic for *Garcetti*'s applicability; rather, "[t]he proper inquiry is a practical one." *Garcetti*, 547 U.S. at 424. For when an employee's official duties include communicating with outside agencies or the press, it would be in dissonance with *Garcetti* to conclude that, when he does so, he enjoys First Amendment protection. *See id.* at 422 ("The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance."). Further, where, as here, the employee is reporting the misconduct of his supervisor, an outside agency may be the most appropriate entity to which to report the misconduct. *See Patterson v. City of Earlington*, 650 F. Supp. 2d 674, 680–81 (W.D. Ky. 2009) (holding that a police chief's report of a mayor's alleged election law violations to state police is not protected because state police were the most appropriate authority to carry out the investigation); *Mantle v. City of Country Club Hills*, No. 4:07-CV-55 (CEJ), 2008 WL 3853432, at *4 (E.D. Mo. Aug. 15, 2008)

12

(holding that a police chief's report of a mayor's criminal conduct to a municipal court judge is not protected because the police chief had no departmental supervisor and the judge was the most appropriate authority to whom he could report).

In turning to the instant case, we cannot say that Kilpatrick's reprimanding Gibson for reporting the illegal use of the gas card to outside agencies violated Gibson's clearly established constitutional rights. Gibson was the Chief of Police for the city, indicating that communicating with outside law enforcement agencies was part of his job responsibilities. The presumption is buttressed by Gibson's admission that he reported his concerns about the gas card to law enforcement officers at the outside agencies whom he had met through his official duties. It is also supported by his statement in a letter to the Mayor and Board of Aldermen that he worked with the FBI and DEA as part of his role as Chief of Police. Further, Gibson's statutory duties provide additional support to the notion that he was acting pursuant to his official duties. As a law enforcement officer, Gibson's "primary responsibility [was] the prevention and detection of crime . . . [and] the apprehension of criminals." *See* Miss. Code Ann. § 45-6-3(c). Gibson, as Chief of Police, was the City of Drew's "chief law enforcement officer" and had "control and supervision of all police officers employed by" the city. Miss. Code Ann. § 21-21-1. While we cannot, and do not, rely on official job descriptions, even statutory ones, in applying *Garcetti*'s rule, they can be instructive. *See Williams v. Riley*, 275 F. App'x 385, 389 (5th Cir. 2008) (unpublished) (per curiam). In addition, given that Gibson reported to the Mayor and the Board of Aldermen, there was, arguably, no one else to whom Gibson could confidentially report the information. Gibson was the "chief law enforcement officer," *see* Miss. Code Ann. § 21-21-1, and according to the district court's findings of fact, the only entities to which he could have reported within the chain of command were

Kilpatrick and the Board. Reporting to Kilpatrick—the suspected perpetrator—clearly was undesirable, while reporting to the Board might have required public disclosure of Gibson's suspicions, perhaps endangering the subsequent investigation. Indeed, it appears that once Board members learned of the investigation, one of them informed Kilpatrick. The state agencies Gibson contacted may well have been the most appropriate entities to receive the information, a fact other courts have found instructive. *See Patterson*, 650 F. Supp. 2d at 680; *Mantle*, 2008 WL 3853432, at \*4.

Moreover, the facts of this case make plain that Gibson was acting pursuant to his official duties when he made the reports to the OSA. For Gibson did not merely make a report to the OSA on his personal time after work. He met with the investigator in his office, he coordinated his department's resources with the OSA, and he instructed his employees to aid extensively in the investigation. All of this is compelling circumstantial evidence that Gibson reported the misuse of the gas card not as a citizen, but in his official capacity as Chief of Police. *See Garcetti*, 547 U.S. at 422 ("The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance."); *id.* ("Refusing to recognize First Amendment claims based on government employees' work product does not prevent them from participating in public debate. The employees retain the prospect of constitutional protection for their contributions to the civic discourse. This prospect of protection, however, does not invest them with a right to perform their jobs however they see fit."). The fact that what was being reported in this case was public corruption does not change the result—*Garcetti*'s rule is a broad one, and it must be applied even where it may lead to a potentially distasteful result in an individual case. As such, any reprimand based on Gibson's reports to the OSA cannot be said to violate his clearly established constitutional rights.

Similarly, reprimanding Gibson for his report to the Attorney General would not have violated his clearly established First Amendment rights. Gibson communicated his concerns about the gas card at the "Chief of Police Conference" to the Mississippi Attorney General in person. He spoke with the Attorney General and others who were with him for about twenty minutes. Given that Gibson was attending a chief of police conference when he met with the Attorney General and expressed his concerns, it would not have been objectively unreasonable for Kilpatrick to believe Gibson made the report while performing his official duties. To the extent that additional facts could show that Gibson was not acting pursuant to his official duties when he made his report to the Attorney General, Gibson has failed to meet his burden of producing evidence sufficient to show that Kilpatrick violated his clearly established constitutional rights. *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010) ("Once a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defense is not available.").

The reports to the FBI and DEA present a closer case. Gibson made a call to an FBI agent that he had met through his law enforcement work. He then met with two FBI agents, including the agent he already knew, at schools in Drew rather than at his office. He testified that he believed his report to the FBI was confidential. He also made his initial complaint to the DEA via telephone, then met with DEA agents, and agents from other federal law enforcement agencies, at the DEA office in Oxford, Mississippi, again not at his office in Drew. Gibson testified that he believed his report to the DEA was also confidential. Gibson did, however, testify that he had previously met the agents he contacted at the FBI and the DEA through his official duties. Further, he stated in a letter to the Mayor and Board of Aldermen that he generally worked with outside agencies, including the DEA and FBI, "to help with crimes within the city of Drew." Additional facts could elucidate Gibson's

role when he made his complaints in this case. Whether he spoke with the agents during working hours, whether he was in uniform, and whether he offered the assistance of local law enforcement would all be instructive as to whether he acted pursuant to his official duties. But those facts are not present in the record, and, there being no genuine dispute as to the facts, we take the record as it is. Given the lack of evidence clarifying Gibson's role when he made his reports to the FBI and the DEA, we hold that Gibson has not met his burden of producing evidence sufficient to show that Kilpatrick violated his clearly established constitutional rights, and, as such, summary judgment should have been granted for Kilpatrick. *See Kovacic*, 628 F.3d at 211; *Michalik v. Hermann*, 422 F.3d 252, 258 (5th Cir. 2005) ("The plaintiff bears the burden of proving that a government official is not entitled to qualified immunity."). We do not hold that, as the Chief of Police, *any* report of criminal activity Gibson made to outside agencies was part of his official duties. We hold only that Gibson has adduced insufficient evidence here to meet his burden of producing evidence showing that his reports here were made as a citizen rather than in his official capacity. He has therefore failed to come forward with evidence showing that his clearly established constitutional rights were violated.

As such, Gibson's communications to the outside agencies in this case are distinguishable from previous cases in which we have held that communications outside the chain of command are speech as a citizen. Therefore, we cannot say that reprimanding Gibson for reporting violations of the law to outside law enforcement agencies violated his clearly established constitutional rights.

### III. Motion to Dismiss

The district court dismissed Gibson's tort claims without prejudice for failure to comply with the MTCA notice requirement. Gibson cross-appeals,

arguing that the district court erred in dismissing his malicious interference with employment claim, but he does not appeal the dismissal with respect to his other tort claims.  Kilpatrick moved to dismiss this appeal for want of jurisdiction. We agree. *See Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 565 (5th Cir. 2003) (declining to exercise pendent appellate jurisdiction over a state law tort claim in an interlocutory appeal of the district court's order denying qualified immunity).  Accordingly, we grant Kilpatrick's motion to dismiss Gibson's cross-appeal for lack of jurisdiction.

### IV. Conclusion

For the foregoing reasons, we REVERSE the district court's order denying Kilpatrick's motion for summary judgment based on qualified immunity and GRANT the motion to dismiss Gibson's cross-appeal for lack of jurisdiction. Finally, we REMAND the case to the district court for further proceedings consistent with this opinion.  Gibson shall bear the costs of this appeal.