# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
January 4, 2022

Lyle W. Cayce
Clerk

No. 20-20583

Charles E. Foerster,

*Plaintiff—Appellant*,

*versus*

Austin Bleess; City of Jersey Village,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-1782

---

Before Jones, Southwick, and Costa, *Circuit Judges*.

Per Curiam:[*]

Charles Foerster is the former Chief of Police in the City of Jersey Village, Texas. He filed claims against the City and its manager, alleging violations of his federal and state constitutional rights because he was fired for speaking out about potential wrongdoing. The district court granted the Defendants' motions for judgment on the pleadings. We AFFIRM.

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 20-20583

## FACTS AND PROCEDURAL HISTORY

Because we are reviewing a judgment that the plaintiff's pleadings were insufficient, the following is a summary of the complaint's version of the relevant events. Charles Foerster served as the Chief of Police for Jersey Village, Texas from 2010 until he was fired in 2019. In July 2018, Mark Zatzkin, then a city policeman, gave Foerster a memorandum describing the alleged circumstances of the 2008 termination of James Singleton from the police force. In May 2018, Singleton had been elected to the city council. Foerster showed the memorandum to the Jersey Village City Manager, Austin Bleess. Bleess read the memorandum, returned it to Foerster, and stated: "I don't want this, and if this memo ever finds its way to the public, you'll be terminated."

In September 2019, Zatzkin became the subject of an internal affairs investigation after an alleged violation of police department policies. The investigation recommended that Zatzkin be demoted and placed on probation. After being informed of the recommendations, Zatzkin told Foerster he would show his 2018 memorandum to Singleton to prevent any disciplinary action. Foerster received Zatzkin's appeal of the investigation results, denied the appeal, and upheld the recommended discipline.

A few days later, city councilmember Singleton posed questions to another police officer about the incident leading to Zatzkin's discipline. That officer told Foerster about the inquiry; separately, Bleess reversed the disciplinary actions against Zatzkin. The same day, Foerster informed Bleess that Singleton potentially was violating a provision of the Jersey Village City Charter that prohibits members of the City Council from interfering in hiring and firing decisions. *See* Jersey Village, Tex., Code of Ordinances, part 1, art. II § 2.08.

2

No. 20-20583

Two days after that, Foerster emailed Bleess, claiming Zatzkin blackmailed Singleton, causing Singleton to interfere in Zatzkin's personnel matter. Bleess suspended Foerster two days later, listing numerous criticisms of Foerster's job performance dating back more than a year. While at his home the next day on suspension, Foerster used his personal email account to contact the Mayor and selected members of the City Council about the alleged blackmailing and violations of the City Charter. His email included both a copy of the Zatzkin memorandum allegedly used to blackmail Singleton and Foerster's original email to Bleess, discussing his theory on the City Charter violation. Bleess fired Foerster on October 25, 2019.

Foerster filed this action in Texas state court, alleging violations of his free speech rights protected by the First Amendment to the United States Constitution, under 42 U.S.C. § 1983, and by article 1, section 8 of the Texas Constitution. The defendants filed an answer and removed the case to the United States District Court, Southern District of Texas. Shortly thereafter, the defendants filed Rule 12(c) motions for judgment on the pleadings, which the district court granted. Foerster timely appealed.

## DISCUSSION

An appeal from a judgment on the pleadings in favor of defendants requires us to accept the complaint's well-pled factual allegations as true. *See Bosarge v. Mississippi Bureau of Narcotics*, 796 F.3d 435, 439 (5th Cir. 2015). In our *de novo* review of the grant of a Rule 12(c) motion, we consider "the contents of the pleadings, including attachments thereto." *Id.* at 440 (quoting *Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014)). Attachments to a defendant's motion to dismiss are considered part of the pleadings if the plaintiff refers to them in the complaint and those attachments are central to the claim. *Id.* Where attachments to a

3

defendant's motion supplement the complaint, they may be considered; where they conflict with claims in the complaint, they are excluded because of the "presumption of truth" given to the complaint at this stage of litigation. *See id*. at 440–41 (citations omitted). To withstand a motion to dismiss under Rule 12(c), the complaint must contain enough factual allegations, accepted as true and "view[ed] . . . in the light most favorable to the plaintiff" to constitute a claim for relief which is plausible on its face. *Bosarge*, 796 F.3d at 439.

Foerster alleges violations of his free speech rights under the First Amendment and the Texas Constitution. In his petition filed in state court, not amended after removal, the claim of a violation of the First Amendment and of similar protections under the Texas Constitution was described this way: "Plaintiff engaged in protected speech as a citizen concerning a matter of public concern when he went outside of his chain of command and his job responsibilities to report to the city council and the mayor that a member of the city council had likely been blackmailed and violated the city charter in response to that blackmail." Because he was suspended when he spoke, Foerster asserts he had "no official duties" and "it is impossible" he was acting within the scope of his job. The City and Bleess respond that Foerster's speech was made in his capacity as police chief because he was participating in an internal personnel matter. In that regard, they view the speech as unprotected.

## I. *First Amendment claims*

"'[A] State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). This dispute requires us engage in a bipartite analysis of Foerster's constitutionally protected interests. First,

we must determine if Foerster spoke "as a citizen on a matter of public concern." *Gibson v. Kilpatrick*, 773 F.3d 661, 666 (5th Cir. 2014). If not, then no constitutional protections are afforded to his speech. If so, then we proceed to the second part of the analysis and consider "whether the government employer had a constitutionally sufficient justification for punishing the employee for his speech by balancing the interest in allowing the speech against the interest in penalizing it." *Id.* at 666–67.

The two-part inquiry reflects the circumstances confronting the government as an employer. "When a public employee speaks pursuant to employment responsibilities, . . . there is no relevant analogue to speech by citizens who are not government employees." *Garcetti*, 547 U.S. at 424. Deciding if "a statement is made as an employee or as a citizen is a question of law." *Graziosi v. City of Greenville*, 775 F.3d 731, 736 (5th Cir. 2015).

The primary question here is whether Foerster was speaking as a government employee or a private citizen when he made his report to the mayor and city council. *See Gibson*, 773 F.3d at 667. To decide if a public employee is speaking as an employee or as a private citizen on a matter of public concern, we analyze whether the person spoke "pursuant to [his] official duties." *Hurst v. Lee Cnty.*, 764 F.3d 480, 484 (5th Cir. 2014). Our "inquiry is a practical one." *Gibson*, 773 F.3d at 667 (quoting *Garcetti*, 547 U.S. at 424). In conducting this fact-intensive analysis, we have considered the relationship between the speech and the employee's job, whether the speech was made up the chain of command, and whether the speech resulted from special knowledge acquired as an employee. *See id.* at 667–68, 670. None of these factors are dispositive.

In classifying Foerster's speech, we first consider the relationship of his speech to the managerial responsibilities he had as police chief. Faced with the possibility that a subordinate officer was improperly using

embarrassing information about a city councilmember, Foerster reported his concerns to his direct supervisor, city manager Bleess. This undercuts Foerster's claim. First, his initial report was made due to his role as a department head. *See Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007) (holding speech related to, but not required by, a job is unprotected). These concerns related to his managerial duties as police chief; indeed, his initial email described Singleton's contact with Foerster's subordinates as "incidents [that] can paralyze an entire workforce." Second, this initial speech was directly within the chain of command. *See Davis v. McKinney*, 518 F.3d 304, 316 (5th Cir. 2008) (holding that speech within "the chain of . . . reporting responsibilities" was made as an employee and thus unprotected). As in *Garcetti*, Foerster believed a legal problem existed and he conveyed his concerns to his supervisor. *See Garcetti*, 547 U.S. at 414. Here, too, the dispositive factor is that Foerster's "expressions were made pursuant to his duties" as police chief. *Id.* at 421.

We acknowledge that Foerster's claims in this litigation focus on his later communications with the city council and the mayor, as opposed to the initial reports to his supervisor Bleess. As we will explain, though, there is no reason for us to enter the analytical labyrinth of the statutes and ordinances relevant to the structure of city governance in Jersey Village in order to decide whether he exited his chain of command.

Our various precedents analyzing "mixed" chain of command speech like that at issue here could be seen as being in some tension. At least one of our decisions suggest that when speech is made "to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen." *Davis*, 518 F.3d at 313. Subsequent cases, though, after acknowledging that *Davis* stated what would "ordinarily" be the case, held that "no single fact or factor" was controlling. *See Gibson*, 773 F.3d at 670.

*Gibson* also suggested that some reporting to an "outside agency" may still be unprotected if that agency is "the most appropriate entity to which to report the misconduct." *Id.*

Two recent cases have stressed that employee speech, made within or outside the chain of command and which would otherwise be unprotected from being the basis for discipline, is not transformed into protected speech simply by continuing to express those same concerns to certain external parties. *Corn v. Mississippi. Dep't of Pub. Safety*, 954 F.3d 268, 278 (5th Cir. 2020); *Anderson v. Valdez*, 913 F.3d 472, 478 (5th Cir. 2019). If the employer could discipline the employee for the "initial speech," the employee cannot "escape the discipline of his employer for breach of his employee duties by going public with the same speech." *Anderson*, 913 F.3d at 479.

*Corn* is particularly instructive. There, two employees of the Mississippi Department of Public Safety claimed they were fired for reporting an internal investigation into police officers' issuing of non-existent traffic violations. *Id.* at 272. Though the initial reports were within the employees' chain of command, eventually they reported to the National Highway Traffic Safety Administration, a federal agency. *Id.* We rejected the First Amendment retaliation claims. The initial reports were clearly related to their job duties, which militated against a finding that the speech was protected. *Id.* at 277 (citing *Davis*, 518 F.3d at 312). Their subsequent report to the federal agency was "simply a continuation of unprotected speech." *Id.* at 278 (citing *Anderson*, 913 F.3d at 478 & n.24). We concluded that because the initial speech occurred within the hierarchy of their employer, "the similar external speech that trails [was] also unprotected as it track[ed] internal complaints." *Id.*

The same is true here. Foerster began the complaint process with Bleess, his direct supervisor. His criticisms were spelled out explicitly:

Singleton's alleged meddling was undermining his workforce and their ability to do their jobs. When he was rebuffed, he contacted the mayor, several councilmembers, and again Bleess in order to rebut criticisms of his job performance. Some of those individuals may have been outside his chain of command, but we do not need to decide if that is so. The substance of those emails was a continuation of the original complaints to Bleess that Singleton's involvement was interfering with Foerster's ability to manage his officers. Further, the email was a direct response to Bleess's criticisms of Foerster's job performance, including the Singleton incident, and it related directly to the performance of Foerster's duties. Indeed, Foerster invoked his "26 years of law enforcement" to support his argument that Singleton's actions had a negative impact on the force.

In categorizing Foerster's actions, we conclude he never acted as a private citizen but instead was seeking within the structure of city government to perform his official duties in the most effective way he could.

We are not persuaded by Foerster's reliance on our decision in *Charles v. Grief*, 522 F.3d 508 (5th Cir. 2008). There, an employee of the Texas Lottery Commission alleged that he had suffered retaliation for raising concerns about racial discrimination to members of the Texas legislature. *Id.* at 510. We held that his First Amendment claims were not foreclosed because he ignored "the normal chain of command" and his speech was "not made in the course of performing or fulfilling his job responsibilities." *Id.* at 514. Indeed, we held that his speech was "not even indirectly related to his job." *Id.* The same cannot be said for Foerster's speech in this case.

Foerster also argues his speech is protected because he sought to report public malfeasance, relying on *Lane v. Franks*, 573 U.S. 228 (2014). *Lane* presented the narrow question of "whether public employees may be fired . . . for providing truthful subpoenaed testimony outside the course of

their ordinary job responsibilities." *Id.* at 235. The Supreme Court's answer was narrow as well: "Truthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes." *Id.* at 238. We later stated that "*Lane* thus relied upon an independent legal obligation to tell the truth." *Gibson*, 773 F.3d at 669–70. Foerster presents no such claim here. He was not called before any court; there is no evidence of an ongoing investigation into wrongdoing in Jersey Village. Unlike in *Lane*, Foerster's ordinary job responsibilities included maintaining order and morale in his department.

Foerster also contends he must have been speaking as a private citizen because he was suspended at the time he spoke, and therefore he had no job duties. He cites our court's holding in *Anderson v. Valdez*, 913 F.3d 472 (5th Cir. 2019), for the proposition that a *severed* employee has no job duties. A suspended employee is still an employee, though, a point that Foerster does not dispute. We conclude that the caselaw we have discussed regarding public employees fully applies.

Though we conclude no relief can be granted under the First Amendment, we acknowledge that a troubling set of facts is before us. The conduct that led to Foerster's termination was hardly misconduct; indeed, it was a reporting of what Foerster thought were improper actions of others. Still, the "government entity has broader discretion to restrict speech when it acts in its role as employer." *Garcetti*, 547 U.S. at 418. We need not consider the validity of the other grounds Bleess described for Foerster's termination, which a fact finder might conclude were pretextual. It is sufficient for us to deny the First Amendment claim on the basis that Foerster's reporting of alleged malfeasance stemmed from a workplace personnel matter. *Garcetti* plainly forecloses First Amendment retaliatory claims when they stem from speech made "pursuant to [a person's] official duties." *Id.* at 421. Foerster's claims under the First Amendment fail.

## II. *Texas constitutional claims*

Foerster brings the same claims under the Texas Constitution. This is the relevant sentence of the Texas Constitution: "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." Tex. Const. art. I, § 8.

Foerster asserts that the state constitution provides more protection to his speech than does the First Amendment. That general premise finds support in a few Texas Supreme Court opinions stating that the free-speech clause of the state constitution may be broader than the First Amendment. *See Ex parte Tucci*, 859 S.W.2d 1, 5 (Tex. 1993); *Davenport v. Garcia,* 834 S.W.2d 4, 8–9 (Tex. 1992). That court has also held, though, that unless the party asserting heightened protection can provide an explanation anchored in the state constitution for why that is so, the state constitution's free-speech rights will be interpreted identically to those in the First Amendment:

> Here, Barber has not articulated any reasons based on the text, history, and purpose of Article I, section 8 to show that its protection of noncommercial speech is broader than that provided by the First Amendment under the circumstances presented. Accordingly, we decline to hold that the Texas Constitution affords Barber greater rights than does the First Amendment

*Texas Dep't of Transp. v. Barber*, 111 S.W.3d 86, 106 (Tex. 2003).

Foerster provides neither caselaw nor his own articulation of the "text, history, and purpose" of the state constitution to support broader protections to his speech in this context. *Id.* Foerster's claims under the state constitution therefore fail.

### III. *The City's liability under* Monell

Foerster also alleged the City's liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), because it "officially adopted and promulgated the decision to terminate Foerster" and that decision was made by Bleess, to whom the City had delegated policymaking authority. To establish a municipality's liability on such a claim, "a plaintiff must show the deprivation of a federally protected right caused by action taken pursuant to an official municipal policy." *Hutcheson v. Dallas Cnty.*, 994 F.3d 477, 482 (5th Cir. 2021) (quoting *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010)). Any liability under *Monell* requires a governmental entity to deprive someone of a federally protected right. Because we hold Foerster's First Amendment claims fail, his *Monell* claim fails too.

AFFIRMED.